MOORE, Chief Justice
(concurring specially).

Introduction

I concur in the opinion of the majority that D.H., the mother of the minor children in this case, did not establish a change of circumstances sufficient to transfer custody to her from H.H., the father of the minor children. I write specially to state that the homosexual conduct of a parent — conduct involving a sexual relationship between two persons of the same gender — -creates a strong presumption of unfitness that alone is sufficient justification for denying that parent custody of his or her own children or prohibiting the adoption of the children of others.
In this case there is undisputed evidence that the mother of the minor children not only dated another woman, but lived with that woman, shared a bed with her, and had an intimate physical and sexual relationship with her. D.H. has, in fact, entered into a “domestic partnership” with her female companion under the laws of the State of California. But Alabama expressly does not recognize same-sex marriages or domestic partnerships. § 30-1-19, Ala.Code 1975. Homosexual conduct is, and has been, considered abhorrent, immoral, detestable, a crime against nature, and a violation of the laws of nature and of nature’s God upon which this Nation and our laws are predicated. Such conduct violates both the criminal and civil laws of this State and is destructive to a basic building block of society — the family. The law of Alabama is not only clear in its condemning such conduct, but the courts of this State have consistently held that exposing a child to such behavior has a destructive and seriously detrimental effect on the children. It is an inherent evil against which children must be protected.
The Court of Civil Appeals erred in concluding that a change of custody was justified in this case. The court’s holding not only contradicts the findings of the trial court, which heard the evidence ore tenus, but it also violates the established law of this State and defies logic and reason. The Courts of Alabama should continue to recognize that a homosexual lifestyle is “illegal under the laws of this state and immoral in the eyes of most of its citizens.” Ex parte D.W.W., 717 So.2d 793, 796 (Ala.1998).

I. The Ore Tenus Standard

In a child-custody case where a trial court is presented with ore tenus evidence, an appellate court must presume that the trial court’s findings of fact are correct. Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). The appellate court must not substitute its judgment or “reweigh the evidence,” but will reverse only if the trial court has abused its discretion or if that *27 court’s determination so lacks factual support as to be plainly and palpably wrong. 676 So.2d at 1324. The trial court is in the best position to hear the evidence, to observe the witnesses, and, therefore, to sit in judgment of disputed evidence presented ore tenus. 676 So.2d at 1324. An appellate court oversteps its bounds when it presumes itself the superior arbiter of testimony previously viewed, heard, and judged — in living color — by a trial judge elected to do precisely that.
The Jefferson Circuit Court was presented evidence ore tenus in this child-custody ease. Much of the evidence was disputed and contradictory; the trial court considered all of it. The trial court accordingly found that the father had not abused the children and that the mother had failed to prove that a modification of custody was required.
In determining whether a change of custody would meet the Ex parte McLendon, 455 So.2d 863 (Ala.1984), standard, i.e., whether the benefits of a change of custody would offset the inherently disruptive effect caused by uprooting the children, the Court of Civil Appeals stated: “No evidence indicated that the mother’s homosexual relationship, which is accepted under California law through the ‘Domestic Partnership Act,’ would have a detrimental effect on the well-being of the children.” 830 So.2d at 20. By its holding, the Court of Civil Appeals implied that the trial court had abused its discretion in weighing the evidence. This statement indicates that the Court of Civil Appeals considered the mother’s homosexual conduct in itself to be a neutral factor that would have no detrimental effect upon the children; it contradicts even the argument of the mother, D.H., who stated in her brief that “[t]he only negative factor that the trial court could find regarding the mother was that she had a domestic partner.” The Court of Civil Appeals not only reweighed the evidence in violation of the ore tenus standard but also recategorized homosexual conduct of a parent as not detrimental to the minor children.
For the Court of Civil Appeals to incorporate into its opinion the evidence presented by the mother, while largely ignoring the father’s testimony, witnesses, and characterization of the evidence is improper. It is not an appellate court’s duty to overturn a trial court’s judgment absent an abuse of discretion by the judge, who observed the witnesses and heard the evidence presented to him. Nor is it an appellate court’s duty to redefine the morals of the State of Alabama. This Court is correct in upholding the trial court’s ore tenus finding and Alabama precedent, which holds that homosexual conduct by a parent is inherentíy detrimental to children. Here, the trial court did not abuse its discretion, and the Court of Civil Appeals is clearly in error.

II. The Law in Alabama

In the context of child-custody disputes, this Court, in Ex parte J.M.F., 730 So.2d 1190 (1998), recently reaffirmed that it is within a trial court’s discretion to determine that the homosexual conduct and relationship of a parent seeking custody or a modification of custody is detrimental to the children. In J.M.F., this Court affirmed a trial court’s change in custody from the mother to the father, where the father had remarried and the mother was engaged in “an open lesbian relationship.” 730 So.2d at 1195.
In J.M.F., the mother and her lesbian partner had “established a two-parent home environment where their homosexual relationship [was] openly practiced and presented to the child as the social and moral equivalent of a heterosexual mar *28 riage.”[1] 730 So.2d at 1195. In doing so, this Court said that the mother had “chosen to expose the child continuously to a lifestyle that is ‘neither legal in this state, nor moral in the eyes of most of its citizens.’” 730 So.2d at 1196 (quoting Ex parte D.W.W., 717 So.2d at 796).
Only months before its decision in J.M.F., this Court, in awarding a mother only restricted visitation rights held that “the trial court did not abuse its discretion in considering the effects on the children of their mother’s ongoing lesbian relationship.” Ex parte D.W.W., 717 So.2d at 796. This Court held that the restriction of visitation was a “common tool[ ] used to shield a child from the harmful effects of a parent’s illicit sexual relationships—heterosexual or homosexual.” 717 So.2d at 796 (footnote omitted). Moreover, this Court noted that because “conduct inherent in lesbianism is illegal in Alabama,” § 13A-6-65(a)(3), Ala.Code 1975, the mother was “continually engaging in conduct that violates the criminal law of this state.” 717 So.2d at 796.
“Exposing her children to such a lifestyle, one that is illegal under the laws of this state and immoral in the eyes of most of its citizens, could greatly traumatize them. Given both the demonstrable harm to these children that has already occurred and the potential for harm through continued exposure to their mother’s lifestyle, we cannot hold that the trial court abused its discretion in imposing these limitations on [the mother’s] visitation.”
717 So.2d at 796 (emphasis added). Thus, this Court has recognized that homosexual conduct and the homosexual lifestyle have a detrimental effect on the well-being of children. See also H.J.B. v. P.W., 628 So.2d 753, 756 (Ala.Civ.App.1993) (father’s admitted homosexuality was a factor supporting a “change of circumstances sufficient to warrant a change of custody”); McGinnis v. McGinnis, 567 So.2d 390, 392 (Ala.Civ.App.1990) (affirming the trial court’s conclusion that the children’s exposure to their mother’s homosexual relationship and use of illegal drugs “created an environment in which the minor children should not be reared”).[2]
As noted in J.M.F., supra, and D.W.W., supra, homosexual activity is a crime in Alabama. The Alabama Legislature, “rep *29 resenting the collective expression of moral aspirations,”[3] has made- homosexual conduct a Class A misdemeanor. Ala. Code 1975, § 13A-6-65.[4] One commits the crime of “sexual misconduct” when “[h]e or she engages in deviate sexual intercourse with another person.” Ala. Code 1975, § 13A-6-65(a)(3). “Deviate sexual intercourse” is defined in Ala.Code 1975, § 13A-6-60(2), and includes “conduct inherent in [homosexuality].” D.W.W., 717 So.2d at 796. Lest there be any doubt, the Legislature made it clear that its definition of “deviate sexual intercourse” in § 13A-6-65(a)(3) “[made] all homosexual conduct criminal.” Commentary to § 13A-6-65 (emphasis added).[5]
The policy of the law in Alabama toward homosexuality is reflected not only in its Criminal Code, but also in its sex-education programs for public-school students, as stated in § 16-40A-2, Ala.Code 1975:
“(c) Course materials and instruction that relate to sexual education or sexually transmitted diseases should include all of the following elements:
“(8) An emphasis, in a factual manner and from a public health perspective, that homosexuality is not a lifestyle acceptable to the general public and that homosexual conduct is a criminal offense under the laws of the state.” ■
(Emphasis added.)
Alabama’s courts, even beyond the context of a custody dispute, have expressed a moral revulsion to homosexual activity, reminiscént of that expressed by Sir William Blackstone in his Commentaries on the Laws of England. Earlier courts refused even to describe the activity inherent in homosexuality, stating that “[the crime against nature] is characterized as abominable, detestable, unmentionable, and too disgusting and well known to require other definition or further details of description.” Horn v. State, 49 Ala.App. 489, 491, 273 So.2d 249, 250 (1973).
*30 In 1975, the Alabama Court of Criminal Appeals addressed a defendant’s claim that Alabama appellate courts had not defined the crime of sodomy (under the former Criminal Code) as a crime “involv[ing] moral turpitude.” Williams v. State, 55 Ala.App. 436, 437, 316 So.2d 362, 363 (Crim.1975). The Court had “no hesitancy whatever” in concluding that “sexual relations between persons of the same sex,” however denominated, “involves moral turpitude.” 55 Ala.App. at 437, 316 So.2d at 363. “‘“Moral turpitude signifies an inherent quality of baseness, vileness, [and] depravity,” ’ ” and “ ‘ “implies something immoral itself, regardless of the fact whether it is punishable by law.”’” 55 Ala.App. at 437, 316 So.2d at 363 (quoting McElroy, Law of Evidence in Alabama § 145.01(7)(2d ed.1959)). “ ‘The doing of the [homosexual] act, and not its prohibition by statute fixes the moral turpitude.’ ”[6] 55 Ala.App. at 437, 316 So.2d at 363 (quoting McElroy § 145.01(7)). The Court agreed that “ ‘[t]he practice of sodomy is inherently inimical to the general integrity of the human person, and is clearly an offense involving moral turpitude whether defined by common law or by statute.’” 55 Ala.App. at 437, 316 So.2d at 364 (quoting 70 Am.Jur.2d Sodomy § 2 (emphasis omitted)).
Having made the point that the crime of sodomy involves moral turpitude, the Williams Court made its condemnation of such conduct unequivocal: “We are aware of no other crime at common law that has been as vehemently and copiously characterized as infamous.” 55 Ala.App. at 438, 316 So.2d at 364. Although the Court referred to Britain’s 1967 “decriminalization of homosexual behavior by consenting adults in private,” id., the Court explained that the nation’s earlier history, law, and literature counseled otherwise and “[testified] alike to the generally recognized baseness of the crime, and the word infamous is usually found as a concomitant epithet.” 55 Ala.App. at 438, 316 So.2d at 364. The act itself is so “infamous” that the slanderous or libelous accusation of someone being guilty of the crime is “one of the most grievous wrongs”:
“ ‘If any crime, says Bacon, deserved to be punished in a more exemplary manner, this one certainly does. Other crimes may be prejudicial to society, but this one strikes at its being. A person who has been guilty of so abusing his faculties will not be likely afterwards to have a proper regard for the opposite sex. The tendency is to deprave the appetite and produce in the person insensibility to the most ecstatic pleasure which human nature is capable of enjoying — the society of women.... The tendency of the imputation is to degrade the person charged both morally and socially, and forever brand him with unpardonable infamy and disgrace — a social outlaw; and hence the charge, if unfounded and maliciously made, must be regarded as one of the most grievous wrongs known to the law of our land.’ ”
Williams, 55 Ala.App. at 438, 316 So.2d at 364 (quoting Newell, Slander and Libel § 116 (3d ed.)).
Finally, as if to remove any doubt that homosexuality is disfavored, the court marshaled further legal precedent:
*31 “If we need to say more, if the record of constant quadrimillennial revulsion of moralistic civilizations from the vice that evoked the total and everlasting destruction of Sodom and Gomorrah has been blurred by the mutations of a few years of a single century, we underscore what was said in Horn v. State, 49 Ala.App. 489, 273 So.2d 249 (1973):
“ ‘The statute here questioned only fixes the punishment for crime against nature, a criminal offense recognized as against human morality and to apply to carnal copulation contrary to nature by the common law and anciently. We adopted the England common law. Title 1, § 3, Code of Alabama 1940, Recompiled, 1958. Johnson v. State, 18 Ala.App. 70, 88 So. 348 [(1921)]. Public and legal history is replete with knowledge of this criminal offense.’ ”
55 Ala.App. at 438-39, 316 So.2d at 365.
Other Alabama statutes reinforce the idea that homosexuality is an evil disfavored under the law. Art. VIII, § 182, Ala. Const.1901, lists conviction for sodomy as one of the offenses that will disqualify a person from being able- to vote. Section 16-1-28 forbids the use of public funds or facilities by a college or university to “directly or indirectly, sanction, recognize, or support the activities or existence of any organization or group that fosters or promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws....” Section 30-2-1(5), Ala.Code 1975, lists the commission of a “crime against nature” as a ground for divorce.
Thus, the policy of the law in Alabama— from its civil law to its Criminal Code to the educational programs provided to its public-school students — consistently condemns homosexual activity and the homosexual lifestyle. The effect of such a lifestyle upon children must not be ignored, and'the lifestyle should never be tolerated.

III. Alabama Common Law

American law derives its principles from the common law of England, clearly explained in Commentaries on the Laws of England by Sir William Blackstone. In 1799, Associate Justice of the United States Supreme Court, James Iredell, charged the grand jury of the Circuit Court for the District of Pennsylvania as follows:
“[F]or near SO years [The Commentaries on the Laws of England] has been the manual of almost every student of law in the United States, and its uncommon excellence has also introduced it into the libraries, and often to the fa-vourite reading of private gentlemen; so that [Sir William Blackstone’s] views of the subject could scarcely be unknown to those who framed the Amendment to the Constitution,.... ”
Claypoole’s American Daily Advertiser, April 11, 1799, Philadelphia, 3 The Documentary History of the Supreme Court of the United States, 1789-1800, at 347 (Mae-va Marcus, ed., Columbia University Press 1990) (emphasis added). Because Blackstone’s Commentaries was the manual for law students in the United States during and after the revolutionary period and the drafting of the United States Constitution, we should consider his interpretations of common law not only as influential but also as authoritative for applying the common law today.
Blackstone’s explanation of the common law is important because of the influence it has had upon the American legal system. In 1993, Justice Antonin Scalia stated:
“The conception of the judicial role that [Chief Justice John Marshall] possessed, and that was shared by succeeding generations of American judges until very recent times, took it to be ‘the province *32 and duty of the judicial department to say what the law is,’ Marbury v. Madison, 1 Cranch 137, 177[, 2 L.Ed. 60] (1803) (emphasis added) — not what the law shall be. That original and enduring American perception of the judicial role sprang not from the philosophy of Nietzsche but from the jurisprudence of Blackstone, which viewed retroactivity as an inherent characteristic of the judicial power, a power ‘not delegated to pronounce a new law, but to maintain and expound the old one.’ 1 W. Blackstone, Commentaries 69 (1765).”
Harper v. Virginia Dep’t of Taxation, 509 U.S. 86, 107, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (Scalia, J., concurring).
Natural law forms the basis of the common law.[7] Natural law is the law of nature and of nature’s God as understood by men through reason, but aided by direct revelation found in the Holy Scriptures:
“The doctrines thus delivered we call the revealed or divine law, and they are to be found only in the Holy Scriptures. These precepts, when revealed, are found upon comparison to be really a part of the original law of nature, as they tend in all their consequences to man’s felicity.”[8]
1 William Blackstone, Commentaries 42. Blackstone’s Commentaries explain that because our reason is full of error, the most certain way to ascertain the law of nature is through direct revelation. The ultimate importance of this law and its influence upon our law cannot be understated.
“Upon these two foundations, the law of nature and the law of revelation, depend all human laws; that is to say, no human laws should be suffered to contradict these. There is, it is true, a great number of indifferent points, in which both the divine law and the natural leave a man at his own liberty; but which are found necessary for the benefit of society to be restrained within certain limits. And herein it is that human laws have their greatest force and efficacy; for, with regard to such points as are not indifferent, human laws are only declaratory of, and act in subordination to, the former.”
1 Blackstone, Commentaries 42.
There are impeccable American sources for the above proposition. James Wilson, Associate Justice on the first United States Supreme Court and signer of both the Declaration of Independence and the United States Constitution, said:
“Human law must rest its authority ultimately upon the authority of that law which is divine.... Far from being rivals or enemies, religion and law are twin sisters, friends, and mutual assistants. Indeed, these two sciences run into each other.”
James Wilson, “Of the General Principles of Law and Obligation,” in 1 The Works of the Honourable James Wilson, 104-06 *33 (Bird Wilson ed., Bronson and Chauncey 1804). John Jay, first Chief Justice of the United States Supreme Court and coauthor of the Federalist Papers, declared:
“[N]o sovereign ought to permit those who are under his Command to violate the precepts of the Law of Nature, which forbids all Injuries.... ”
“John Jay’s Charge to the Grand Jury of the Circuit Court for the District of Virginia, May 22, 1793, Richmond, Virginia.” 2 The Documentary History of the Supreme Court of the United States, 1789-1800, at 386 (Maeva Marcus, ed., Columbia University Press 1988).
Our own Declaration of Independence refers to “the laws of nature and of nature’s God”:
“When, in the course of human events, it becomes necessary for one people to dissolve the political bonds which have connected them with another, and to assume among the powers of the earth, the separate and equal station to which the laws of nature and of nature’s God entitle them, a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation.”
(Emphasis added.) It would be an odd logic to assert that the American colonies could use the law of God “to dissolve the political bonds which have connected them with another, and to assume among the powers of the earth, the separate and equal station to which the laws of nature and of nature’s God entitle them,” but not to decide the fundamental basis of their laws.
Alabama has adopted the common law, as evidenced by § 1-3-1, Ala.Code 1975. That section states:
“The common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this state, shall, together with such institutions and laws, be the rale of decisions, and shall continue in force, except as from time to time it may be altered or repealed by the Legislature.”
Our cases have held consistently and frequently that Alabama is a common-law state. See, e.g., Louisville & N.R.R. v. Cook, 168 Ala. 592, 53 So. 190 (1910); Hollis v. Crittenden, 251 Ala. 320, 37 So.2d 193 (1948); State v. Taylor, 415 So.2d 1043, 1047 (Ala.1982). Our jurisprudence explains that old English statutes are a part of the common law. The statutes passed in England before the emigration of our ancestors, which amend the law and are applicable to our situation, constitute a part of our common law. See, e.g., Nelson v. McCrary, 60 Ala. 301 (1877); Clark v. Goddard, 39 Ala. 164 (1863); Carter v. Balfour’s Adm’r, 19 Ala. 814 (1851).
Homosexuality is strongly condemned in the common law because it violates both natural and revealed law. The author of Genesis writes: “God created man in His own image, in the image of God He created him; male and female He created them.... For this reason a man shall leave his father and his mother, and be joined to his wife; and they shall become one flesh.” Genesis 1:27, 2:24 (King James). The law of the Old Testament enforced this distinction between the genders by stating that “[i]f a man lies with a male as he lies with a woman, both of them have committed an abomination.” Leviticus 20:13 (King James).
From the passage in Leviticus 20:13, the early western legal tradition garnered its laws on homosexuality. The Corpus Juris Civilis is the sixth-century encyclopedic collection of Roman laws made under the sponsorship of Emperor Justinian. “It is Justinian’s collection which served as the basis of canon law (the law of the Christian Church) and civil law (both European and *34 English).”[9] The following is a statement in Law French from Corpus Juris:
“ ‘Sodomie est crime de majeste vers le Roy Celestre,’ and [is] translated in a footnote as ‘Sodomy is high treason against the King of Heaven.’ At common law ‘sodomy’ and the phrase ‘infamous crime against nature’ were often used interchangeably.”
Raymond B. Marcin, Natural Law, Homosexual Conduct, and the Public Policy Exception, 32 Creighton L.Rev. 67 (1998) (quoting 58 C.J. 785). In the Middle Ages, St. Thomas Aquinas, a preeminent disciple of natural-law theory, called homosexuality “contrary to right reason” and “contrary to the natural order.” St. Thomas Aquinas, 4 Summa Theologica, Secunda Secundae, Quest. 154, Art. 11 (Benziger Bros. Press 1947).
Sodomy was codified by statute as a serious crime early in England. “The earliest English secular legislation on the subject dates from 1533, when Parliament under Henry VIII classified buggery (by now a euphemism for same-sex activity, bestiality, and anal intercourse) as a felony. Penalties included death, losses of goods, and loss of lands.” Vern L. Bullough, Homosexuality: A History 34 (New American Library 1979). Taking his cue from this tradition, Sir Edward Coke, the dean of English law, called homosexuality “a detestable, and abominable sin, amongst Christians not to be named, committed by carnal knowledge against the ordinance of the Creator, and order of nature, by mankind with mankind, or with brute beast, or by womankind with brute beast.” Blackstone called it “the infamous crime against nature,” 4 Blackstone, Commentaries 215, a phrase used interchangeably with sodomy at common law. Marcin, supra, at 67.
America borrowed from England this steadfast view of homosexuality as an intolerable evil. “[Sodomy] was made a felony by an English statute so early that it was a common-law offense in this Country, and statutes expressly making it a felony were widely adopted.” Rollin M. Perkins & Ronald N. Boyce, Criminal Law 465 (3d ed.1982). In its second edition, published in 1910, Black’s Law Dictionary tells us that sodomy “is often defined in statutes and judicial decisions as meaning ‘the crime against nature,’ ... or as carnal copulation, against the order of nature .... ” Black’s Law Dictionary 1094 (2d ed.1910).
*35 To disfavor practicing homosexuals in custody matters is not invidious discrimination, nor is it legislating personal morality. On the contrary, disfavoring practicing homosexuals in custody matters promotes the general welfare of the people of our State in accordance with our law, which is the duty of its public servants. Providing for the common good involves maintaining a public morality through both, our criminal and civil codes, based upon the principles that right conscience demands, without encroaching on the jurisdiction of other institutions and the declared rights of individuals.
The State may not interfere with the internal governing, structure, and maintenance of the family, but the protection of the family is a responsibility of the State. Custody disputes involve decision-making by the State, within the limits of its sphere of authority, in a way that preserves the fundamental family structure! The State carries the power of the sword, that is, the power to prohibit conduct with physical penalties, such as confinement and even execution. It must use that power to prevent the subversion of children toward this lifestyle, to not encourage a criminal lifestyle.
The family unit doés consist, and always has consisted, of a “father, mother and their children, [and] immediate kindred, constituting [the] fundamental social unit in civilized society.” Black’s Law Dictionary 604 (6th ed.1990). To reward a parent, who steps outside that unit by committing a “crime against nature” with custody of a child would represent a reprehensible affront to the laws of family government that the State must preserve. The best interests of children is not promoted by such a subversion of fundamental law, the very foundation of the family and of society itself. The State may not — must not — encourage the destruction of the family.
No matter how much society appears to change, the law on this subject has remained steadfast from the earliest history of the law, and that law is and must be our law today. The common law designates homosexuality as an inherent evil, and if a person openly engages in such a practice, that fact alone would render him or her an unfit parent.
In this case, the Court of Civil Appeals stated that “[n]o evidence indicated that the mother’s homosexual relationship, which is accepted under California law through the ‘Domestic Partnership Act,’ would have a detrimental effect on the well-being of the children.” The “detrimental effect” of such conduct is established by the great mass of Alabama law, which prohibits and condemns homosexual conduct. Courts must make decisions based on fixed principles. Judges should not make decisions based on the latest psychological or sociological study or statistical poll,[10] the interpretations of which
*36 are subject to the bias[11] and philosophical leanings of the researchers,[12] and which are subject to being refuted by other studies.[13]
*37 Homosexual behavior is a ground for divorce, an act of sexual misconduct punishable as a crime in Alabama, a crime against nature, an inherent evil, and an act so heinous that it defies one’s ability to describe it. That is enough under the law to allow a court to consider such activity harmful to a child. To declare that homosexuality is harmful is not to make new law but to reaffirm the old; to say that it is not harmful is to experiment with people’s lives, particularly the lives of children.[14]
Blackstone sums up the duty of the judge, who is “sworn to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one.” 1 Blackstone, Commentaries 69.

Conclusion

Sexual relations between persons of the same gender violate both the criminal and civil laws of this State and have been declared by our courts to be “inherently immoral.” 55 Ala.App. at 437, 316 So.2d. at 363. Evidence before the trial court in this case indicates that D.H., the mother of the minor children, not only participated in such illicit and immoral conduct, but also would knowingly expose her children to its devastating effects. The trial judge properly found that D.H. was not entitled to custody under the facts of this case. The findings of the trial court based on ore tenus evidence must be affirmed, absent an abuse of discretion. The Court of Civil Appeals erred in reversing the judgment of the trial court and holding that there *38 was no evidence indicating that the mother’s homosexual relationship would have a detrimental effect on the children. From its earliest history, the law of Alabama has consistently condemned homosexuality. The common law adopted in this State and upon which our laws are premised likewise declares homosexuality to be detestable and an abominable sin. Homosexual conduct by its very nature is immoral, and its consequences are inherently destructive to the natural order of society. Any person who engages in such conduct is presumptively unfit to have custody of minor children under the established laws of this State. D.H. is no exception. Therefore, I concur in reversing the judgment of the Court of Civil Appeals in this case.

. In a footnote, the Court noted that Alabama "forbids the issuance of a marriage license '... to parties of the same sex,’ ” and does not recognize as valid a same-sex "marriage” that occurred or was alleged to have occurred elsewhere. 730 So.2d at 1195 n. 3 (quoting Act No. 98-500, Ala. Acts 1998, now codified as § 30-1-19, Ala.Code 1975).

. To varying degrees, other state courts have agreed that a parent’s homosexual behavior and lifestyle may be considered in child-custody and visitation matters. See, e.g., J.A.D. v. F.J.D., 978 S.W.2d 336, 339 (Mo.1998) (courts may "consider the impact of homosexual or heterosexual misconduct upon the children in making a custody determination”); S. v. S., 608 S.W.2d 64, 65 (Ky.Ct.App.1980) (lesbian mother's "deviate practice is sufficient, in this case, to warrant the change” in custody from mother to father); Constant A. v. Paul C.A., 344 Pa.Super. 49, 66, 496 A.2d 1, 10 (1985) ("[T]here are sufficient social, moral and legal distinctions between the traditional heterosexual family relationship and illicit homosexual relationship to raise the presumption of regularity in favor of the licit, when established, shifting to the illicit, the burden of disproving detriment to the children.”); Jacobson v. Jacobson, 314 N.W.2d 78, 80 (N.D.1981) (homosexuality is "a significant factor to be considered in determining custody of children"); Roe v. Roe, 228 Va. 722, 727-28, 324 S.E.2d 691, 694 (1985) (homosexual "father's continuous exposure of the child to his immoral and illicit relationship renders him an unfit and improper custodian” and his "unfitness is manifested by his willingness to impose [upon his child the burden of social condemnation of homosexual lifestyle] in exchange for his own gratification”).

. " 'The State, representing the collective expression of moral aspirations, has an undeniable interest in ensuring that its rules of domestic relations reflect the widely held values of its people.... State regulation has included bans on incest, bigamy, and homosexuality....”' G.G. v. R.S.G., 668 So.2d 828, 831 (Ala.Civ.App.1995), quoting Zablocki v. Redhail, 434 U.S. 374, 399, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (Powell, J., concurring in the judgment).

. Other states make homosexual conduct a crime, most characterizing the prohibited act as sodomy, a "crime against nature,” "buggery,” or, like Alabama, "deviate sexual intercourse.” See, e.g., Idaho Code § 18-6605 (Michie 2000); Kan. Stat. Ann. § 21-3505 (2000); La.Rev.Stat. Ann. § 14.89 (West 2001); Miss.Code Ann. § 97-29-59 (2001); Mo.Rev.Stat. § 566.090 (2001); N.C. Gen. Stat. § 14-177 (2001); Okla. Stat. tit. 21 § 886 (2001); S.C.Code Ann. § 16-15-120 (Law.Coop.2001); Tex. Penal Code Ann. § 21.06 (Vernon 2001); Utah Code Ann. § 76-5-403 (2001); Va.Code Ann. § 18.2-36(Michie 2001).

.Section 13A-6-60 defines "deviate sexual intercourse” as “[a]ny act of sexual gratification between persons not married to each other involving the sex organs of one person and the mouth or anus of another.”
The Legislature explained in the Commentary to § 13A-6-65:
"In the original draft, § 13A-6-65(a)(3) covered deviate sexual intercourse without lawful consent under the same terms and circumstances as subdivision (a)(1) covers vaginal intercourse. If both actors were adult and both consented, there was no offense; but this subdivision was changed by the legislature to make all homosexual conduct criminal, and consent is no defense. However, § 13A-6-65(a)(3) does not apply to married persons, as this is not within the basic definition of ‘deviate sexual intercourse.' Section 13A-6-60(2). See also, § 13A-6-70(b)(3).”
(Emphasis added.)

. The court explained further its definition of moral turpitude:
" 'Moral turpitude means something "immoral in itself.... It must not be merely mala prohibita, but the act itself must be inherently immoral.... It is the nature of the act itself, and not its legislative characterization or punishment which must be the test in determining whether or not it involves moral turpitude.” ' ”
Williams, 55 Ala.App. at 437, 316 So.2d at 363 (quoting McElroy § 145.01(7), quoting in turn Ex parte Marshall, 207 Ala. 566, 566, 93 So. 471, 471-72 (1922)).

. There can be no debate as to the connection between the common law and the natural law. Alabama uses a phrase that harkens back to the natural law — "crime against nature” — to refer to homosexuality. See § 30-1-19, Ala.Code 1975. Chief Justice Sir Christopher Wray and the entire Court at King's Bench resolved a point of law as follows:
"That in this point, as almost in all others, the common law was grounded on the law of God....”
Ratcliff's Case, 76 Eng. Rep. 713, 726 (K.B. 1592).

. Blackstone indicated that one law was more reliable than the other:
"If we could be as certain of the [natural law] as we are of the [revealed law], both would have an equal authority; but, till then, they can never be put in any competition together.”
1 William Blackstone, Commentaries 42.

. Vern L. Bullough, Homosexuality: A History 32 (New American Library 1979).
“Another important academician who had a significant impact upon the continued influence of Roman law in England was Va-carius, a gifted scholar who had taught Roman law at Bologna. Vacarius founded the law school at Oxford and it is generally recognized that his influence 'began a new era in the history of English law and of its connection with the legal system of Rome.’ [Quoting Burdick, The Principles of Roman Law, 67 (1938).] Vacarius was the first professor of law in England and one of his most popular texts, a summary of law for poor students, was essentially a condensed version of Justinian's Code and Digest.
“The most ancient work on the common law, a Latin text written between 1187 and 1189 called A Treatise of the Laws and Customs of England, was written by Ranulf deGlanvill who was a student of Vacarius. [Citing Stubbs, ‘The History of the Canon Law in England,' in 1 Select Essays in Anglo-American Legal History, 248, 259 (1907).] Glanvill enjoyed the complete confidence of Henry II and became his Chief Justice in 1190. Glanvill’s treatise, which clearly pays tribute and reference to Roman law and Justinian's Code and Digest, was the standard text book on the laws of England and established the method of legal writing for centuries to come.”
Richard A. Pacia and Raymond A. Pacia, Roman Contributions to American Civil Jurisprudence, 49 Rhode Island Bar Journal 5, 35 (May 2001).

. The American Psychiatric Association ("APA”) has for years debated the harmful effects of homosexuality. Apparently, the answer rests upon who makes the most noise and has the most supporters at the APA’s annual meetings. For many years, the APA regarded homosexuality as a pathological mental disorder. However, in 1973, the APA voted to declassify homosexuality as a disorder.
"In 1970, ... gay activists confronted their tormenters at the [APA's] annual convention in San Francisco. They wanted to remove the characterization of homosexuality as a psychiatric disorder.... Irving Bie-ber, then the leading antigay psychiatrist, was laughed off the stage by gay protesters .... The crowd ... erupted in pandemonium at the conclusion of the [presentation]. While some psychiatrists clamored for air fare refunds, others called on the police to shoot the protestors.
“Dr. Kent Robinson, a psychiatrist, ... negotiated a panel at the 1971 APA conven *36 tion, which would include gay representatives. Robinson contacted gay activist Frank Kameny to organize the panel. Despite securing an official panel at the 1971 convention in Washington, D.C., the activists ... continued to organize street protests. On May 3, 1971, gay activists stormed the stately Convocation of Fellows at the APA Convention, and Kameny seized the microphone to deliver a diatribe against the profession: 'Psychiatry is the enemy incarnate. Psychiatry has waged a relentless war of extermination against us. You may take this as a declaration of war against you.’ Gay activists later went on to conduct their panel. At the end of the convention, Kameny and his fellow panelists demanded that the APA revise its diagnostic manual to delete references to homosexuality as a psychiatric disorder.
"Two years later, after continued pressure from gay activists, ... the APA's Nomenclature Committee was poised to accept the change.”
William N. Eskridge, Jr., Challenging the Apartheid of the Closet: Establishing Conditions for Lesbian and Gay Intimacy, Nomos, and Citizenship, 1961-1981, 25 Hofstra L.Rev. 817, 934-35 (1997).

.Apparently, there is widespread bias among those researching the very area we are dealing with in this opinion — the effects upon children of parents who practice homosexuality:
"This reticence [of the researchers] is most evident in analyses of sexual behavior and identity — the most politically sensitive issue in the debate. Virtually all of the published research claims to find no differences in the sexuality of children reared by lesbigay parents and those raised by nongay parents — but none of the studies that report this finding attempts to theorize about such an implausible outcome. Yet it is difficult to conceive of a credible theory of sexual development that would not expect the adult children of lesbigay parents to display a somewhat higher incidence of homoerotic desire, behavior, and identity than children of heterosexual parents.”
Judith Stacey & Timothy J. Biblarz, (How) Does the Sexual Orientation of Parents Matter?, 66 Official Journal of the American Sociological Association 159, 163 (April 2001). Stacey & Biblarz are quite candid in their belief that homosexuality is a healthy and moral lifestyle.
"It is quite a different thing, however, to consider this issue a legitimate matter for social science research. Planned lesbigay parenthood offers a veritable 'social laboratory’ of family diversity in which scholars could fruitfully examine not only the acquisition of sexual and gender identity, but the relative effects on children of the gender and number of their parents as well as of the implications of diverse biosocial routes to parenthood.... To exploit this opportunity, however, researchers must overcome tfie hetero-normative presumption that interprets sexual differences as deficits, thereby inflicting some of the very disadvantages it claims to discover.”
Stacey & Biblarz, supra, at 179.

. One prominent psychiatrist analyzed the APA's decision as follows:
"The APA could only take the action it did by disregarding and dismissing hundreds of psychiatric and psychoanalytic research papers and reports that had been done on homosexuality over the previous two decades .... The APA ignored the science, and, for reasons that were nothing but political, 'cured' homosexuality by fiat.”
Charles W. Socarides, Homosexuality: A Freedom Too Far 74 (Adam Margrave Books 1995). Thus began the "scientific” endorsement of homosexuality. There have even been attempts to prove that homosexuality is genetically determined. Michael Bailey and Richard Pillard’s famous study of twins is one such attempt. J. Michael Bailey & Richard Pillard, A Genetic Study of Male Sexual Orientation, 48 Archives of General Psychiatry 1089, 1090 (1991). Commenting on Michael Bailey's study, Anne Fausto Stirling, a developmental biologist at Brown University, criticized: "It’s such badly interpreted genetics.” D. Gelman et al., Homosexuality: Genetic Aspects, Newsweek, Feb. 24, 1992, at 46.

. See, e.g., Theo G.M. Sandfort et al., Same-Sex Sexual Behavior and Psychiatric Disorders, 58 Archives of General Psychiatry 85, 88 (table) (Jan.2001) (homosexuals are three times more likely than heterosexuals to suffer from mood disorders); 58 Archives of General Psy *37 chiatry at 88 (table) (homosexuals are five times more likely to have suffered from bipolar disorder); J. Michael Bailey, Homosexuality and Mental Illness, 56 Archives of General Psychiatry 883, 884 (Oct.1999); 58 Archives of General Psychiatry at 88 (table) (homosexuals are twice as likely to have suffered from major depression, neuroses, eating disorders, and phobias within their lifetime). Council on Scientific Affairs, American Medical Association, Health Care Needs of Gay Men and Lesbians in the United States, 275 JAMA 1357 (1996); Joanne M. Hall, Lesbians Recovering from Alcohol Problems: An Ethnographic Study of Health Care Experiences, 43 Nursing Research 238 (1994); Anne H. Faulkner et al., Correlates of Same Sex Sexual Behavior in a Random Sample of Massachusetts High School Students, 88 Am. J. of Pub. Health 262 (Feb. 1998) (homosexuals run a significantly greater risk for substance abuse); Curtis D. Proctor et al., Risk Factors for Suicide Among Gay, Lesbian, and Bisexual Youth, 39 Social Work 504 (Sept. 1994) (homosexuals run a much greater risk for suicide); Journal Watch, 31 Nation's Health 18 (July 2001) (reporting that homosexual youth were more than twice as likely to commit a violent crime and were at a higher risk of being attacked by others); and Gary Remafedi, Adolescent Homosexuality: Psychosocial and Medical Implications, 79 Pediatrics 331, 334 (March 1987) (noting that nearly one-half of all young homosexuals have been arrested, placed in juvenile detention or arraigned in juvenile court on at least one occasion).
Homosexual activists have proffered that many, if not all, of the mental problems associated with homosexuals are not due to homosexuality; rather, they argue, these problems are due to a "homophobic” and "intolerant” society. Eskridge, supra, 75 N.Y.U. L.Rev. at 1378. However, recent studies appear to contradict this proposal. See 18 Harvard Mental Health Letter 4 (Aug.2001) (reporting that in the Netherlands, "a country that is especially tolerant of homosexuality,” homosexuals continue to exhibit a much higher incidence of mental health problems).

. Certain sociologists seem to have no compunction encouraging such experiments or "natural laboratories”:
"When researchers downplay the significance of any findings of differences [between heterosexual and homosexual parents], they forfeit a unique opportunity to take full advantage of the 'natural laboratory' that the advent of lesbigay-parent families provides for exploring the effects and acquisition of gender and sexual identity, ideology, and behavior.”
Stacey & Biblarz, supra, at 162-63.