This appeal arises from a judgment of the Houston Circuit Court modifying a custody determination, in which Amy Johnson Riley ("the mother") and Kristopher Riley ("the father") were awarded joint custody of Madison Riley ("the child"), their daughter.
The record reveals that the mother and the father were married in January 1998 and that the child was born in July 1998. The mother and the father separated in May 1999 and were divorced in October 1999. In its judgment of divorce, the trial court incorporated a settlement agreement entered into by the mother and the father under which, among other things, joint custody of the child was vested in the mother and the father, with the mother having physical custody and the father having weekend, holiday, and summer visitation.
In September 2000, the father filed his first petition to modify custody, averring that there had been a change in circumstances and that it was not in the best interests of the child to remain in the physical custody of the mother and that he should therefore be awarded physical custody of the child. However, that petition was dismissed in April 2001 "for lack of action." In July 2001, the father filed a second petition seeking the same relief; the mother answered the petition and denied its material allegations. In November 2001, the father moved for an order granting him custody of the child pendente lite; that motion was accompanied by an affidavit executed by the child's maternal grandfather in which he opined that the mother "tends to move her residence frequently" and that "it would be in the best interest" of the child to reside with the father because of a perceived "instability in [the mother]'s household." The trial court then awarded physical custody of the child to the father (with visitation to the mother) pending a hearing on the father's petition.
In February 2002, after denying an oral motion to dismiss the father's petition to modify, the trial court received testimony from the parties at a hearing on the petition. The father testified to having worked for an employer named "Persian Gallery" for the five years preceding the hearing and to having remained in the home the parties had inhabited at the time of the divorce in 1999. The father also testified that at the time of the divorce, the mother and the child resided in an apartment with a female roommate, but that the mother had moved with the child into a residence with the mother's boyfriend, Ashley Scarce, and that she had subsequently moved into a residence with the child's maternal grandfather, from there into a house trailer adjacent to Scarce's parents' home, and then into a residence she shared with a man other than Scarce.
The father testified that he had sought custody of the child because the mother had been difficult to contact and because the child had indicated a reluctance to return to the mother's home after visitation with the father. The father testified that he did not "approve" of the mother's living with men to whom she was not married, opined that for the child to be *Page 344 
"seeing mommy . . . with different guys" "would be bad for" her, and stated that he had a problem with the mother's frequent changes of residence. However, on cross-examination, the father admitted that the mother had always provided a home for the child, that he could not say how the child had been affected by the mother's moves, and that he knew of no harm that had come to the child from the mother.
The mother, on examination by the father's counsel, testified that she had lived in Headland for the six months before trial with the child and with two sons fathered by Scarce (i.e., the child's half brothers), and with all three children and Scarce for six months before that. The mother admitted that she never married Scarce and testified that her father (i.e., the child's maternal grandfather) had not liked Scarce and had disapproved of her having children out of wedlock. The mother also confirmed that Scarce and another boyfriend had had a physical altercation at a commercial establishment and that she had occasionally left the child in the care of a babysitter and in the care of Scarce's mother. Although the mother admitted to having had financial problems and admitted that her trailer had been repossessed because she did not make the payments on the loan used to purchase the trailer, she testified that she had no problems paying her bills at the time of trial.
On examination by her counsel, the mother testified that she had always seen that her children were well cared for, that she had not left the children with untrustworthy caretakers, and that her several moves had been undertaken so as to improve her situation. She described her current home as a three-bedroom, two-bathroom home that would afford the child a room of her own, and she testified that she was working for a local hospital on its night shift; she also testified that after the entry of the pendente lite custody order, on each occasion when the child was being returned to the father's care after visitation with the mother, the child would begin crying. Finally, the mother testified that she could call upon her own mother and Scarce's mother to help care for her children.
After counsel had completed questioning the mother, the trial court asked the mother several questions. Among other things, the mother testified that the child's half brothers were living with her; that she and Scarce had separated six months before the trial; that she had contacted the Department of Human Resources to assist her in obtaining child support from Scarce, who has not regularly paid such support; that she and Scarce had not entered into a common-law marriage and that she had not sought a divorce from Scarce; and that she had lived with Scarce when the child was between 16 months and 3 years of age. The trial court's examination then continued:
 "THE COURT: Okay. And do you see anything wrong with that living arrangement?
 "[The mother]: We should have been married, you know, legally, but, no.
"THE COURT: You don't see anything wrong with it?
 "[The mother]: [Scarce] loved [the child] just like his own.
 "THE COURT: Ma'am, the question is, did you see anything wrong with living with a man that you were not married to with a young child in the house?
"[The mother]: I suppose so, yes, sir."
After the mother had completed her testimony, but before the parties could call another witness, the trial court made the following remarks:
 "THE COURT: Well, I'm going to be truthful about it. I've heard enough. *Page 345 
Anybody that is going to live with an unmarried man in front of their small daughter like this, y'all know how the Court feels about it. And, you know, I've never given custody back to anybody in that situation. And I'm not going to do it now.
 "And for you, ma'am, not to even think much about it, that further proves to me that you don't need that kid. So the kid is — Mr. Riley, you can have custody of the child. That is just the way I feel about it, and have always felt about it.
 "[Counsel for the mother]: Your Honor, just another thing. It make[s] no difference that the relationship is no longer —
 "THE COURT: It just shows a pattern to me. Especially, what she feels about it, to me that she says she do[es]n't think that it's wrong or anything, it will probably continue with somebody else. I'm not going to have that child in a home somewhere with an unmarried man. I'm just not. And them not being married. I'm not going to have it. The child is three years old now. And who's to say when she is four or five, which is probably going to be the case, she's going to be living with another man somewhere, raising kids.
 "[Counsel for the mother]: She said that she knew it was wrong.
 "THE COURT: Then she came back and said something that indicated that — nope. I can't have her have that child."
After the trial court subsequently entered a judgment on the case action summary sheet awarding custody of the child to the father, the mother filed a motion, pursuant to Rule 59(e), Ala. R. Civ. P., to alter, amend, or vacate the judgment, contending, among other things, that the trial court had erred in "divining an irrebuttable presumption" that a mother is unfit to maintain custody if she cohabitates with a man to whom she is not married and in concluding that the father had met his burden, under Exparte McLendon, 455 So.2d 863 (Ala. 1984), of demonstrating that a change in custody will materially promote the best interests of the child and that the benefit to the child will more than offset the disruptive effect caused by the uprooting of the child. The mother also filed a motion, pursuant to Rule 52(b), Ala. R. Civ. P., for specific findings of fact, which she later renewed so as to request, in the alternative, that the parties be directed to submit proposed findings of fact and conclusions of law. The trial court denied the mother's postjudgment motions, prompting the mother's appeal to this court.
On appeal, the mother contends, among other things, that the trial court's judgment is contrary to Wade v. Clark,564 So.2d 982 (Ala.Civ.App. 1990), in that the trial court changed custody of the child to the father based solely upon the mother's indiscreet conduct.
As our Supreme Court noted in Ex parte J.M.F., 730 So.2d 1190
(Ala. 1998), "[i]t is, of course, well established that a noncustodial parent seeking a change of custody must show not only that he or she is fit to have custody, but that the change would materially promote the child's best interests." 730 So.2d at 1194 (citing Ex parte McLendon, supra). "This requires a showing that the positive good brought about by the modification would more than offset the inherently disruptive effect caused by uprooting the child." 730 So.2d at 1194. Moreover, the Alabama Supreme Court has made clear that "a change of custody from one parent to another is not a decision to be made lightly; on the contrary, it may be made only where the evidence discloses anobvious and overwhelming *Page 346 necessity for change." Ex parte Peppers, 703 So.2d 299, 302
(Ala. 1997).
Although the trial court's written order does not include factual findings or conclusions of law, the basis of the trial court's decision to modify its previous award of custody is set forth at length in its oral remarks during its February 2002 hearing. A review of those remarks indicates that the trial court granted the change in custody because the mother, during the time she had physical custody of the child, had admittedly lived with a man who was not her husband.
In Wade, supra, this court considered an appeal brought by a child's mother from a judgment modifying the divorce judgment so as to transfer custody of the child to the father. In that case, the father had sought the change in custody on the ground that the mother was, at the time of the petition, living with a man who was not her husband; at trial, the mother "admitted to such living arrangements." 564 So.2d at 983. This court reversed the judgment changing custody, reasoning as follows:
 "Evidence of `indiscreet' conduct may be considered as a factor in custody modification actions; however, custody will not be modified where the party seeking the change fails to establish a substantial detriment[al] effect on the welfare of the child as a result of the `indiscreet' conduct. Here, the record is devoid of any evidence that tends to show that the mother's activities were in any way detrimental to [the child]. The record is similarly devoid of any evidence tending to show that a change in custody would `materially promote' [the child]'s best interest and welfare.
 "The father had the burden of showing that the mother's living arrangements had a detrimental effect on the child and that transferring custody to him would `materially promote' the welfare and best interests of the child. This he failed to do.
 "Where evidence is heard ore tenus by a trial court, the court's findings will not be disturbed unless plainly and palpably wrong. Here, the evidence simply does not warrant a change in custody. We find, therefore, that the trial court erred in transferring custody from the mother to the father."
564 So.2d at 983 (citations omitted); cf. Ex parte J.M.F., 730 So.2d at 1194 (stating, after noting the McLendon standard, that "[w]here a parent seeks a change of custody based solely upon the heterosexual misconduct of the custodial parent, our law requires that there be an additional showing that the misconduct has a detrimental effect upon the child").
In this case, the trial court left no doubt about its opinion that "[a]nybody that is going to live with an unmarried man in front of [a] small daughter" was not entitled to retain custody, stating that it had "never given custody back to anybody in that situation" and that it would not do so in this case. However, Alabama law does not permit a trial court to abruptly terminate a custody hearing and uproot a child based solely upon a finding that the child's custodial parent is cohabitating, or has cohabitated, with a member of the opposite sex to whom the custodial parent is not married. Simply put, "living with someone of the opposite sex without the benefit of marriage" "is not evidence of a substantial detrimental effect on a child in theabsence of any proof of harm to the child." Phillips v.Phillips, 622 So.2d 410, 412 (Ala.Civ.App. 1993) (emphasis added). Here, the father, although disapproving of the mother's personal life, could not demonstrate any adverse effects upon the child and admitted that he knew of no harm to the child caused by the mother's activities.
Although we are mindful of the strong presumption in favor of the correctness of *Page 347 
custody judgments (see, e.g., Wade, supra), we must conclude, based upon Alabama caselaw and the record in this case, that the trial court plainly and palpably erred in changing custody of the child based upon a finding that the mother had lived with a man out of wedlock. Because the current evidentiary record does not reveal "an obvious and overwhelming necessity" that custody of the child be changed from the mother to the father (Ex partePeppers, supra), we must reverse the judgment of the trial court and remand for further proceedings consistent with Wade and Exparte J.M.F.
REVERSED AND REMANDED.
YATES, P.J., and PITTMAN, J., concur.
THOMPSON and MURDOCK, JJ., dissent.