900 So.2d 1230 (2004)
M.W.W.
v.
B.W.
2030032.
Court of Civil Appeals of Alabama.
September 10, 2004.
Rehearing Denied November 19, 2004.
*1231 Angela A. Cochran of Robert K. Jordan, Attorney, P.C., Fort Payne, for appellant.
Submitted on appellant's brief only.
YATES, Presiding Judge.
M.W.W., the mother, appeals from a judgment modifying custody and ordering her to pay B.W., the father, child support.
The parties were divorced in 1997. At the time of the divorce, the parties were awarded joint custody of their two daughters, with the mother having primary physical custody and the father having visitation. On December 10, 2002, the father filed a petition for modification of custody and a petition for contempt, alleging that the mother was restricting and/or withholding his visitation rights. The father sought primary physical custody of the daughters. On December 12, 2002, the mother filed a petition for modification of custody and a petition for contempt, alleging that the father had failed to pay child support, had failed to reimburse her for certain medical expenses related to the daughters, and had failed to maintain medical insurance on the daughters as ordered in the original divorce judgment. The mother sought sole custody of the daughters.
On January 8, 2003, the mother filed a petition for suspension of visitation, alleging that the father had sexually abused the older daughter. The mother also sought to suspend visitation with the younger daughter until an investigation into the alleged abuse could be made. On February 3, 2003, the father filed a petition for immediate relief, seeking temporary custody of both daughters.
Following ore tenus proceedings on all the pending matters, the trial court entered an order, which stated the following findings of fact:
"1. The parties divorced in 1997 and physical custody of the minor children has been with the [mother] continuously since that time. The [father] exercises visitation.
"2. Both parties have since remarried.
"3. Circumstances surrounding the visitation between the [father] and the minor children, especially during the time leading up to his remarriage, strained the relationship between the minor children and the [father] somewhat.
"4. The [mother] has made substantial efforts to influence the minor children against the [father].
"5. During the month of January 2003, following the Court's intervention to enforce the [father]'s visitation, the older [daughter] made sexual abuse allegations against the [father] and refused to visit accordingly.
"6. Per the parties' agreement, the parties and [the older daughter] submitted to a polygraph examination regarding the sexual abuse allegations. The [father] was found to be truthful in his denials and the [mother] and [the older daughter] were found to be untruthful in their allegations.

*1232 "7. Despite the polygraph results, [the older daughter] continues to maintain her allegations against the [father].
"8. The [younger daughter], at times, has expressed that she also did not wish to visit with the [father]. This arises from influence from the [mother] and possibly from [the older daughter].
"9. [The younger daughter] and the [father] appear to continue to have a good relationship at present.
"10. The parties were evaluated by David R. Wilson, Ph.D, of Gadsden Psychological Services and all cooperated well with the evaluation. Further counseling with the parties and the [daughters] is necessary for the continued mental health and relationships of the parties.
"11. There is considerable lingering animosity between the parties and the parties have shown no ability to communicate or act together toward the best interest of their children. It is necessary for the parents to recognize the importance of each parent's involvement in the lives of the children in order for healthy parent/child relationships to thrive.
"12. The parties are presently incapable of cooperating in any joint physical custodial arrangement.
"13. The present rift between the [father] and [the older daughter] are irremediable by immediate Court action.
"14. Both parties have substantially mishandled the familial relationships subsequent to the parties' divorce in 1997.
"15. The [mother]'s husband presently provides the insurance coverage for the [daughters] and the [father] reimburses him for the $164.54 per month premium."
Pursuant to its findings, the trial court awarded the mother sole custody of the older daughter and awarded the father sole custody of the younger daughter. The court suspended the father's visitation with the older daughter "until the Court finds it to be in the child's best interest upon appropriate petition and hearing." The mother was awarded visitation with the younger child. The parties were ordered to participate in individual and family counseling. The mother was ordered to pay the father $249.60 per month in child support. The father was ordered to reimburse the mother for $520.03 in unpaid medical bills for the daughters.
The mother argues that the trial court abused its discretion in awarding the father sole custody of the younger daughter. She also argues that the trial court incorrectly calculated the amount of child support she owed.
Pursuant to the original divorce judgment, the mother was awarded primary physical custody of the younger daughter, and, therefore, she was the custodial parent. See Hays v. Elmore, 585 So.2d 40 (Ala.Civ.App.1990). Based on the trial court's previous award to the mother of primary physical custody, we are governed by the standard set out in Ex parte McLendon, 455 So.2d 863 (Ala.1984), in reviewing the trial court's modification of custody. In accordance with McLendon, a parent seeking to modify custody must demonstrate that the change in custody would materially promote the child's welfare and that the inherent disruption caused by the change in custody would be offset by the advantages of that custody change. "The evidence in support of a modification of custody must be substantial, and it must demonstrate an overwhelming necessity for a change." Smith v. Smith, 865 So.2d 1207, 1210 (Ala.Civ.App.2003)(citing Klapal v. Brannon, 610 So.2d 1167 (Ala.Civ.App.1992)). *1233 "The ore tenus rule is applicable to child-custody-modification proceedings, and the court's judgment based on findings of fact will not be reversed absent a showing that the findings are plainly and palpably wrong." P.A.T. v. K.T.G., 749 So.2d 454, 456 (Ala.Civ.App.1999)(citing Scholl v. Parsons, 655 So.2d 1060 (Ala.Civ.App.1995)).
The record reflects the following: Polygraph examinations, which both parties agreed would be admissible, indicated that the father was being truthful and that the mother and the older daughter were being deceptive regarding the older daughter's claims that the father "tickled her vaginal area" on several occasions when she was between the ages of 6 and 12 years old. Dr. David Wilson interviewed the parents and the daughters. He testified that based on his observations there were reasons that the older daughter was making allegations against the father other than that she was actually sexually abused by the father. He stated that the timing and the context of the allegations led him to question to truth of the older daughter's allegations.
Dr. Wilson testified that when interviewing the younger daughter she would begin by stating that she did not want to see the father, but that, ultimately, she would state that she wanted to see him; Dr. Wilson attributed the younger daughter's stating that she did not want to see the father to the mother's influence on the daughter. Dr. Wilson also stated with respect to the younger daughter: "She at first seems to be negative, but then, like I said, it's almost like she gets out what she's supposed to say to me, and then she says what appears to be a more accurate representation of her feelings." Dr. Wilson noted that the mother had encouraged the younger daughter to use the mother's current husband's last name and that the younger daughter had told him "that's what my mommy says it is. That's what my mom really wants it to be." The mother and older daughter testified that the younger daughter wanted to use the mother's current husband's last name because the younger daughter had a friend with that same last name. There was evidence indicating that a beauty pageant calendar and a newspaper article concerning the younger daughter's baseball team both listed the younger daughter by the mother's current husband's last name. Dr. Wilson opined that because of the mother's efforts to alienate the younger daughter from the father the younger daughter needed to spend more time with the father. Dr. Wilson's report, which had been ordered by the trial court, stated, in pertinent part:
"I also had information from DHR [the Department of Human Resources] indicating that the allegations of sexual abuse were deemed `not indicated.' I did speak in detail with [the older daughter] about her allegations, and she is persisting in stating that her father did touch her in an inappropriate way. She also appears to have had some inconsistency in her statements. Issues about her credulity are also raised due to the fact that she would have had prior opportunities to disclose this to the Judge, and to two female attorneys who questioned her at court. The timing of the allegations certainly has to raise some concerns. Based on all of this information, including statements from the mother and father, I have concluded that it is unlikely that she has been molested by her father. I have to at least wonder if (1) she has been molested by someone else and (2) her mother may have played a part in somehow (consciously or unconsciously) encouraging her to make these allegations.
"All the contact that I have had with [the mother] has come to suggest in a *1234 very strong way to me that she does not want [the father] to be in the girls' lives at all and her words to me on March 14th summerize it well: `I don't feel like he deserves anything.' This was when I asked her what time he should have with his daughters.
"....
"My contacts with [the younger daughter] (I have seen her on 6 different occasions) indicate that she does love her mother and her father, and she does feel more pressure from her mother. She would typically come into my office and make a brief attempt to tell me that she did not really like her father or want to be with him (especially when she had been brought by her motherthis was not nearly as clear when [the father] brought herand it is important to keep in mind that the child is seen by herself in my office when I am asking these kinds of questions) but then if I simply gave her a chance to talk some more, or if I asked her if she was sure (without accusing her or pushing too much) she would laugh and then say that she did love him and want[ed] to spend time with him and with [the father's current wife]. Her behavior with [the father] and [his current wife], whether in the waiting room, or in my office when I have seen them together, shows her to be very comfortable and loving with them. There was never any resistance at all to her being with himher behavior belies some of the words that she seems to feel compelled to say.
"This does raise the issue of parental alienation, and all of the information that I have seen in this case strongly suggests that this is what [the mother] has been trying to doshe wants her [current husband] to be the father of her children, and she therefore wants to push their father on, and she has done a good job of this with one child, and she appears to be working on the other. She would call me regularly and express concerns and fears about [the younger daughter] having to go see her father for the visitation, and tell me that the child was afraid of him and did not want to go. Then I would get [the younger daughter] in my office and she would say that she had a good time with her father, (once she seemed to get out of her system the apparent need to start off with being negative about him.) It has always seemed to bother [the mother] more for [the younger daughter] to be away from her than it has ever both ered [the younger daughter]. I have concerns that [the mother] does not do a very good job of hiding her own discomfort and anxiety about [the younger daughter] being away from this and [the younger daughter], who is a very perceptive and sensitive child, picks up on this. She does appear to worry more about upsetting her mother than about upsetting her father, and this is likely because she has seen her mother more upset about this. [The younger daughter] has given examples of situations, such as at ball games, indicating that she does feel that she is not supposed to show any affection or positive feelings toward her father, if her mother is watching, and she and her father even talked about them developing a signal she could use to tell him `I love you' without [the] mother seeing this. When I saw [the younger daughter] earlier this week, when she was in the midst of her week with [the father and his current wife], she appeared very positive and happy being with them, and she, in some ways, comes across as less pressured and more spontaneous than when her mother brings her. This suggests to me that she may feel more of an `agenda' from her mother when she *1235 comes, and that she may believe that her mother, because of subtle or implicit, or not so subtle and explicit demands, wants her to be negative about her father. Again, all of this strongly suggests parental alienation syndrome and this has to raise serious questions about [the mother]'s motives. Again, she makes no secret of the fact that she does not think that [the father] should be in their life, and this is always a major concern in this type of case. A healthy parent is able to recognize that the other parent, even if he or she is disliked, still needs to be involved in the life of the child. [The mother] does not appear to be capable of recognizing this, or acting accordingly."
Arlene McFarland, a licensed marriage and family therapist, testified that she had four visits with the mother and the daughters between May and August 2002. She testified that initially she was treating the older daughter for anxiety and that the older daughter was anxious over the father's verbal abuse toward her. McFarland testified that she observed that the mother was sad and felt like she had no control over allowing the daughters visitation with the father. She stated that she treated the older daughter with a technique called "EMDR"[1] and that the older daughter's anxiety level had decreased by the end of their four sessions. McFarland says that she was not aware of any alleged sexual abuse.
The mother, the father, both of their current spouses, and the daughters testified. The older daughter continued to maintain that the father had sexually abused her. The younger daughter testified that the father and the mother do not get along. She stated that she would like to spend one week with the mother and one week with the father. The trial court asked the younger daughter the following:
"Q: Tell me what you think about if you stayed at your dad's more than at your mom's to, kind of, even out that you used to stay with your mom more?
"A: Well, I think that my mom might get mad instead of my dad because then my mom would neverI would get to see him more, and I won't get to see my momI mean, I will get to see my mom less, and I really want to see my mom more than I want to see my dad.
"Q: Okay. Have you told anybody that before? Did you tell Dr. Wilson that you wanted to see your mom more than you wanted to see your dad?
"A: No, sir.
"Q: Okay. When did you decide that?
"A: I decided it when I was talking to the counselor, but I never did tell him that.
"Q: Okay. All right. Now, if I said that your mom wouldn't get mad if you spent more time at your dad's, how would you feel about it?
"A: I think that would be kind of okay.
"Q: Okay. So I don't want toI don't want to tell you what to say. But what I'm trying to find out is: Your concern about living with your dad is *1236 you wouldn't be happy or you're afraid your mom would be less happy?
"A: My mom would be less happy."
"`[A]s a general rule, this court disapproves of custody determinations in which siblings are separated. If the trial court identifies a compelling reason for the separation, however, then such a decision may be justified.'" Overturf v. Leverett, 702 So.2d 469, 470 (Ala.Civ.App.1997)(quoting Hepburn v. Hepburn, 659 So.2d 653, 655 (Ala.Civ.App. 1995) (citations omitted)).
In the present case, the trial court's finding that the present alienation between father and the older daughter was irremediable at this time was well supported by the record. There was also evidence to support the trial court's finding that the mother had attempted to negatively influence the younger daughter's relationship with the father. It is clear from the record that the parents are incapable of cooperating in a joint-custody situation. The trial court's findings and the record demonstrate that the trial court believed that the positive good that would result from a change of custody of the younger daughter would offset any disruptive effect that might be caused by the change in custody. The trial court had a compelling reason for separating the daughters because of the older daughter's current inability to get along with the father and the mother's negative influence on the younger daughter in regard to the father.
The mother cites Mardis v. Mardis, 660 So.2d 597 (Ala.Civ.App.1995), to support her argument that the trial court erred in separating custody of the daughters. In Mardis, the trial court awarded custody of the older daughter to the mother and custody of the younger daughter to the father. However, Mardis is distinguishable from the present case. In Mardis, the older daughter did not want to live with the father because she did not get along with the father's current wife and the younger daughter preferred to live with the mother because of her treatment by the father's current wife. This court held that the trial court did not have a compelling reason to separate the daughters. In the present case, the older daughter's alienation from the father arose out of unproven sexual-abuse allegations and the mother's influence on her. There was also evidence that the mother was attempting to influence the younger daughter's relationship with the father. The trial court's award of custody is affirmed.
The mother also argues that the trial court erred in its award of child support, because, she says, it failed to comply with Rule 32, Ala. R. Jud. Admin. Rule 32(B)(9) provides:
"(9) Split Custody. In those situations where each parent has primary physical custody of one or more children, support shall be computed in the following manner:
"(a) Compute the support the father would owe to the mother for the children in her custody as if they were the only children of the two parties; then
"(b) Compute the support the mother would owe to the father for the children in his custody as if they were the only children of the two parties; then
"(c) Subtract the lesser support obligation from the greater. The parent who owes the greater obligation should be ordered to pay the difference in support to the other parent, unless the court determines, pursuant to other provisions of this rule, that it should deviate from the guidelines."
The trial court computed child support in the following manner: The *1237 mother's gross monthly income was $1,700, and the father's was $1,375.16. Their total combined adjusted gross monthly income was $3,075.16; the mother's gross monthly income amounted to 55% of the parties' combined gross monthly income, and the father's gross monthly income amounted to 45% of the parties' combined gross monthly income. Pursuant to Rule 32, the child-support obligation for two children based on the parties' combined adjusted gross monthly income is $686; the court added to this amount $164.54 that the father paid for insurance, making the total support obligation $850.54. The court then attributed 55% of $850.54 ($467.80) as the mother's support obligation. The court attributed 45% of $850.54 ($382.74) as the father's child-support obligation; the court then subtracted from this amount the $164.54 that the father pays monthly for insurance, making his support obligation $218.20. The court determined the difference between what the mother owed ($467.80) and what the father owed ($218.20), and it ordered that the mother pay the father that amount ($249.60) per month in child support. The child-support obligation should have been calculated in accordance with Rule 32(B)(9), which provides that the mother would owe the father $225.30 per month in child support.[2]
"A noncustodial parent's child-support obligation is determined by the application of the Rule 32 Child Support Guidelines; the application of those guidelines is mandatory. Nelson v. Landis, 709 So.2d 1299 (Ala.Civ.App.1998). The trial court may, within its discretion, deviate from the child-support guidelines; however, in doing so, it must enter a written finding, supported by the evidence, that the application of the child-support guidelines would be unjust or inequitable. State ex rel. Waites v. Isbell, 718 So.2d 85 (Ala.Civ.App.1998); Nelson v. Landis, supra. `A trial court's failure to follow the guidelines or to make a written finding that application of the guidelines would be unjust, is reversible error.' State ex rel. Waites, 718 So.2d at 86."
Allegro v. State ex rel. Lett, 747 So.2d 913, 914 (Ala.Civ.App.1999).
The trial court failed to follow the Rule 32 guidelines in calculating the mother's child-support obligation, and there was no finding regarding whether application of the guidelines would be unjust or inequitable. Accordingly, we must reverse that portion of the trial court's judgment and remand the case for a proper calculation of child support in accordance with Rule 32, Ala. R. Jud. Admin.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result, with writing.
THOMPSON, J., concurs in part and dissents in part, with writing.
MURDOCK, Judge, concurring in the result.
In Klapal v. Brannon, 610 So.2d 1167 (Ala.Civ.App.1992), and in a number of subsequent cases, I believe this court mis-states *1238 the rule of Ex parte McLendon, 455 So.2d 863 (Ala.1984), by stating that, in order to modify the custody of a child, there must be an "overwhelming necessity" for the change. I do not find this standard to be stated anywhere in our Supreme Court's opinion in Ex parte McLendon.
What is required by McLendon is that the child's interest must be "materially promoted" by the proposed change of custody. Both in McLendon, itself, and in the more recent case of Ex parte J.M.F., 730 So.2d 1190, 1194 (Ala.1998), our Supreme Court explains that "material promotion" requires that the positive good to be brought about by the proposed change must "more than offset" the disruption that would be caused thereby. See Smith v. Smith, 865 So.2d 1207, 1211-13 (Ala.Civ.App.2003) (Murdock, J., concurring in the result) (reviewing the text of the Supreme Court's opinion in both Ex parte McLendon and Ex parte J.M.F.).
Further, at that point at which the benefit more than offsets the harm, the modification is inherently and logically in the child's best interest. To hold out for anything morethat is, to "`set[] the bar' for changes of custody at a level higher than does Ex parte McLendon," see Smith, 865 So.2d at 1213 (Murdock, J., concurring in the result)may result in denials of changes of custody in cases when it actually has been shown to be in the child's best interest to make the change. If the best interest of the child is indeed the "polestar" for the legal standards that are to govern our child-custody cases, I believe we must reexamine our occasional reliance on the overwhelming-necessity standard articulated in Klapal v. Brannon. See Smith, 865 So.2d at 1211-13 (Murdock, J., concurring in the result) (reviewing Klapal and the history of the "overwhelming necessity" standard).
Today, this court, once again, reiterates the "overwhelming necessity for a change" standard. 900 So.2d at 1232 (citing Smith and Klapal, supra). Because I find that standard to be one that is not only not expressed in Ex parte McLendon, but is in fact inconsistent with the application of the McLendon standard in many cases, see Smith, 865 So.2d at 1211-13 (Murdock, J., concurring in the result), I cannot fully concur in the analysis of the main opinion.
In fact, this case, in my opinion, is an example of one in which the use of the "overwhelming necessity" standard does set the bar too high. This is a very difficult case. I do not believe the evidence in this case supports a finding of "overwhelming necessity" for a change. In my opinion, therefore, a vote to affirm the trial court's decision to change the child's custody is inconsistent with the application of the overwhelming-necessity standard.
Under the "material promotion" standard that is expressed in Ex parte McLendon, however, I do find sufficient evidence in the record from which I believe we are obligated to affirm the trial court's judgment regarding custody. Given the record before us, I cannot say that the trial court's decision is the same one I would have reached had I been the trial judge. This court, however, is not allowed to reweigh the evidence and substitute our judgment for that of the trial court. I therefore concur in the result reached in the main opinion.
THOMPSON, Judge, concurring in part and dissenting in part.
I agree with that portion of the main opinion reversing the trial court's calculation of child support. However, I disagree with the main opinion's conclusion that the trial court's judgment modifying custody is due to be affirmed. The McLendon standard requires that a parent seeking the *1239 modification of custody of a child demonstrate that the proposed change in custody will materially promote the child's best interests and that the benefits of the change will offset the disruptive effects of the change in custody. Ex parte McLendon, 455 So.2d 863 (Ala.1984). I do not believe that the father met the stringent custody-modification standard set forth in Ex parte McLendon. Therefore, I would reverse the judgment of the trial court awarding custody of the youngest child to the father.
NOTES
[1] There is nothing in the record to indicate what "EMDR" is. However, it appears that McFarland was referring to a therapeutic technique called "Eye Movement Desensitization and Reprocessing." See Joel B. Eisen, The Trajectory of "Normal" After 9/11: Trauma, Recovery and Post-Traumatic Societal Adaption, 14 Fordham Envt'l L.J. 499, 520 n. 96 (2003)(patient is asked to follow the therapist's finger with their eyes while concentrating on the traumatic event, which is supposed to desensitize the patient's traumatic memories).
[2] Pursuant to Rule 32, the child-support obligation for one child based on a combined gross monthly income of $3,075.16 is $443. Adding the insurance premium of $164.54 to $443 equals $607.54. The mother's percentage share of 55% of $607.54 is $334.15, and the father's percentage share of 45% of $607.54 is $273.39. Subtracting the insurance premium from the father's share indicates that the father would owe $108.85 in child support. The difference between the mother's obligation and the father's obligation is $225.30.