Nancy Lou Gamble appeals the trial court's order placing custody of her grandchild with Melissa L. Segers. In May 1999 the trial court determined that Arthur Steven Rich ("the father") and Melissa L. Segers ("the mother"), although unmarried, were the natural parents of M.B.R. ("the child"), born in December 1998. The trial court awarded joint custody of the child to the parents and awarded primary physical custody to the mother. The court also allowed Gamble ("the paternal grandmother") two days per week visitation, including overnight visitation. In November 1999, in response to a petition to modify custody, the trial court awarded "temporary primary physical custody" to the paternal grandmother. On July 18, 2000, the trial court entered an order placing custody with the paternal grandmother and giving the mother and the maternal grandmother overnight visitation every other weekend from 6:00 p.m. on Friday until 4:00 p.m. on Sunday.
On January 29, 2001, the mother filed a petition requesting that custody of the child be returned to her. In her petition she alleged there had been a material change in circumstances; that she could provide a loving, stable home for the child; and that to return custody to her would be in the child's best interest. The paternal grandmother answered; she also filed a counter-petition alleging that she had custody of the child for more than a year preceding the filing of the mother's petition; that the mother is a habitual drug user who is not fit to have care, custody, and control of the child; and that the mother should be ordered to pay child support in accordance with the child-support guidelines.
The case was heard ore tenus on June 20 and June 29, 2001. During the hearing, the following facts were adduced by the evidence. The father had been either incarcerated or under house arrest for various drug-related offenses for 31 months preceding the hearing. The evidence also indicates that he last tested positive for drugs in April 2000. In April 2000 the wife was placed on probation for five years as a result of a drug-related conviction. Since June 2000, the mother had completed a drug-rehabilitation program and had been randomly screened for drugs with no positive readings. Immediately preceding the court hearing, she had signed a lease for a two-bedroom residence in order to move out of her mother's home and to care for her child. A month or two earlier, the mother had taken a position as a waitress at "Fibber's," and was making an average of $250 per week, including salary and tips. On cross-examination, the mother admitted *Page 660 
that she had been arraigned on a felony drug-possession charge two months before the custody hearing. She also stated that on those weekends when she picked up the child for visitation, she often left the child with the maternal grandmother.
The maternal grandmother's neighbor, Katheryn McDonald, stated that since the child's birth, she had seen the maternal grandmother taking care of the child, but had not seen the mother caring for the child. She also noted that a number of young men came to visit the mother and at least one man spent the night on numerous occasions over a period of two or three months. McDonald stated that the mother and one male visitor took the child on a trip to Florida with them at least six months before the hearing. She also testified that on one occasion the maternal grandmother and the mother had a very loud, verbally abusive argument that became physical and that the child was between them during the altercation. On another occasion the mother had cursed McDonald, using profanity in the child's presence.
McDonald's son, Gary Barrett, had moved into a trailer behind his mother's house in September or October 2000. He testified that he had witnessed several fights between the mother and the maternal grandmother that took place outdoors. He once saw the mother snatch the child out of the paternal grandmother's arms and hit the child for not going inside to use the bathroom.
Linda Otis, a Department of Human Resources ("DHR") case worker, testified that she knew all the parties involved in the proceeding. Her file indicated that the mother had tested positive for drugs in November 1999 and that she had counseled the paternal grandmother not to let the mother take the child for visitation if the mother continued to use drugs. In October 2000, Otis had a report that the police had been called to stop an argument between the mother and her mother, who were cursing and arguing outside the maternal grandmother's home. In January 2001, the police were called to stop a physical fight between the mother and the paternal grandmother. The incident was at the maternal grandmother's home, where the mother hit the paternal grandmother, who was holding the child. The file also contained an April 2001 report stating that the mother and her mother were arguing, yelling, and cursing at each other outside the family home; because the child was not present during the argument, DHR took no action. The final report in the DHR file, dated May 3, 2001, indicated that the mother and her mother had had another loud argument — cursing and yelling; this time the child was present and was reported to be upset and crying. That investigation was pending at the time of the hearing. Based on the evidence in the DHR file, Otis stated that if DHR had custody of the child, it would not return the child to the mother yet; the mother would have to prove that she could keep a job and establish her own residence for some time before DHR would consider returning custody of the child to her.
Whit Latham, a probation and parole officer who monitors the mother, testified that he knew she was seeing an undesirable character and that he warned her to stay away from him. Latham stated that during the time the mother has been on parole, she has had several jobs, most lasting only a few months. Latham compared the paternal grandmother's stable home environment with the mother's situation. He concluded that the mother did not presently have a stable home environment in which to raise a child. *Page 661 
Kay Gamble, the paternal grandmother's sister-in-law, testified that the child was loved by the entire extended family. She stated that the child has been happy and well adjusted living with the paternal grandmother. She testified that the mother had a temper and that she had on one occasion cut the tires on the paternal grandmother's automobile.
The paternal grandmother testified that she works a 12-hour shift 15 days each month. This means that when she works, her workday runs either from 8 a.m. to 8 p.m. or from 8 p.m. to 8 a.m. When she is working, the child is not put in day care, but is kept by the paternal grandmother's sister-in-law or by her daughter. During the last six months, the mother had been exercising her visitation rights about 12 days per month. The paternal grandmother stated that she believed that the mother had stopped using drugs, but that she was still seeing the same people who had gotten her into trouble previously. The paternal grandmother testified she told the mother that if she could clean up her lifestyle and provide a stable home for the child, the paternal grandmother would not object to the mother's getting custody. The paternal grandmother stated that she had not seen any lasting changes in the mother sufficient to justify her regaining custody. The paternal grandmother said the fact that the mother might be sentenced to another jail term led her to believe that the mother is not yet a fit person to be the custodian of the child.
On July 18, 2001, the trial court entered an order awarding custody of the child to the mother and ordering the father to pay child support in the amount of $147 each month. The trial court noted that because the paternal grandmother had physical custody of the child since November 1999, all parties to the proceeding should ensure contact between the child and the paternal grandmother "during the period of the child's adjustment to the change of custody."
The paternal grandmother appeals, alleging three grounds of error. These grounds are actually sub-issues of the same basic question: when is a natural parent's prima facie right to custody superceded by a third party? The law in Alabama is well settled that a natural parent has a prima facie right to custody of his or her child over a third party. SeeGurley v. Kennemore, 668 So.2d 1 (Ala.Civ.App. 1993); Ex parte Terry,494 So.2d 628 (Ala. 1986). However, the natural parent's prima facie right to custody does not survive a voluntary forfeiture of custody or a prior judgment removing custody from the natural parent and awarding it to a non-parent. McLendon v. McLendon, 455 So.2d 863, 865 (Ala. 1984). In returning custody of the child to the mother, the trial court may have applied the wrong standard. It is not enough that the parent show that the parent has reformed his or her lifestyle or improved his or her financial position; the parent must show both that he or she is fit and that the custody change materially promotes the best interests and welfare of the child. McLendon, 455 So.2d at 866.
The record is clear that the paternal grandmother was awarded temporary custody of the child in November 1999, as the mother was facing sentencing for her first drug conviction. By an order dated July 18, 2000, the trial court awarded the paternal grandmother custody of the child and awarded the mother specific visitation rights. Those orders, removing the child from her natural parent to place her with a third party, implicate the McLendon standard in any future child-custody determination. Thus, the mother needed to prove not only her fitness, but also the fact that the change in custody would materially promote the best interests of the child and would outweigh the inherent disruptive *Page 662 
effects of the change in custody. See Gurley v. Kennemore, 668 So.2d at 2-3.
The mother offered testimony that she had taken a job in the last two months that provided enough income for her to rent a two-bedroom mobile home. She also introduced evidence indicating that she had completed a drug-rehabilitation program and that she was being regularly screened for drug use. However, a thorough review of the record reveals no evidence from which a court could conclude that a change in custody at this time will "materially promote the best interests and welfare of the child."
The record verifies that the paternal grandmother has been the child's custodian and primary caregiver since the child was 11 months old. We have carefully reviewed all the testimony during the two-day hearing and simply cannot find any ground on which to conclude that the mother met her burden of proof. The child is receiving excellent care from the paternal grandmother and is able to see both her parents at their convenience. Until the natural mother is able to illustrate how a change of custody will materially promote the best interests and welfare of the child so as to outweigh the disruption caused by such change of custody, the correct resolution is to leave the custody of the child with the paternal grandmother. Therefore, we reverse the trial court's order awarding custody to the natural mother, and we remand this case to the trial court for an entry of an order consistent with this opinion.
REVERSED AND REMANDED.
Yates, P.J., and Crawley, Thompson, and Murdock, JJ., concur.