893 So.2d 1228 (2004)
Kimberly L. GONZALEZ
v.
Therron D. PARKER.
2021031.
Court of Civil Appeals of Alabama.
June 25, 2004.
*1229 Martha E. Williams, Cullman, for appellant.
Thomas E. Drake II, Cullman, for appellee.
CRAWLEY, Judge.[1]
Kimberly L. Gonzalez ("the mother") and Therron D. Parker ("the father") were divorced in 1994. The parties had two children; the mother received custody of the children by an agreement incorporated into the divorce judgment. In December 1997, the mother, while suffering from depression and abusing methamphetamines, voluntarily transferred custody of the children to the father. In March 2002, the mother filed a petition seeking a modification of custody. After a trial, the trial court denied the mother's petition. She appeals.
The mother testified that, after transferring custody to the father in 1997, she did not see the children, other than surreptitiously, for approximately one year. She met and married her current husband ("the stepfather") in October 1998 and sought mental-health counseling that same year. The mother said that she was diagnosed as being manic-depressive but that she did not take medication for her condition because it made her condition worse. Instead, she said, she underwent counseling for approximately one year. She was no longer seeing a counselor at the time of trial. The mother and the stepfather make approximately $800 per week from a business they own; the business supplies chicken crews to a local poultry farmer. The wife does not work in the business.
The mother testified that the father committed acts of domestic violence against her during their marriage. She also stated that the father never directed violence toward the children. She testified concerning an altercation after the parties' divorce where the father came to her place of employment, chased her around the parking lot, and later cut the tires on her vehicle over a dispute concerning visitation.
The mother resumed visitation with her children in 1999. The father had insisted that she have supervised visitation because he was concerned that the mother might leave with the children. Although at first the visitations were held at the father's home, eventually the parties agreed, and a trial court ordered, that the mother's visits be supervised by her parents ("the grandparents"). Over the next few months, the father permitted the children to remain in the mother's care for several days at a time. The mother testified that the children would come to her house on the bus every other Friday and would stay until the following Friday and that the parties' daughter would remain with her through the weekend until Monday afternoon because the mother took her to dance class every Monday. The father testified differently, stating that although the children were allowed to spend consecutive days with their mother, the children were never with their mother for an entire week at one time.
*1230 The mother testified that the children had told her that they no longer wanted to live with the father and that they were afraid of him. The mother specifically recalled a discussion with the parties' son on their daughter's birthday in February 2002 where the son told the mother that he would kill himself if he had to go back to the father's house to live. According to the mother, the son reported that the father made him "feel like [crap]" and that the father and his current wife ("the stepmother") fought often. The mother said that she decided to consult an attorney after this incident. When she called the father from the attorney's office, she said, the father was very angry and demanded that she return the children to him. She said that the father subsequently told her that the children could live with her if that is what they wanted. The mother said that she then told the father that she would have the papers for a change of custody drawn up. She filed her modification petition on March 19, 2002.
On March 22, 2002, the father withdrew the children from school in Alabama and, by the end of that week, had relocated to Indiana. He testified at trial that he, the stepmother, and the children had discussed the move in the months preceding it; he denied the mother's allegation that he had moved the children in response to the mother's filing her modification petition. He also said that the stepmother had previously inquired about a transfer to a Wal-Mart discount department store distribution center in Indiana to be near her parents. However, the transfer request form in evidence was completed on March 23, 2002, after the petition to modify had been filed.
The father testified that he had received custody of the children in December 1997. According to the father, the children's teeth were rotten and their vaccinations were either not current or had not been given at the appropriate times. The father said that the children, who were in kindergarten and first grade at the time, were making failing grades, had come to school on consecutive days wearing the same clothing, and had generally been unkempt. According to the father, he decided that the parties' son should be held back a year in school so that he could catch up and that since that time the children's grades had improved. The father testified that the children had been on the A-B honor roll since he had taken custody of them. The father said that the children were allowed to participate in extracurricular activities, provided they could maintain their good grades. He said that he or the stepmother assisted the children with homework as needed.
The father recounted that the mother had not seen the children for approximately one year after he took custody of them in December 1997. When the mother did return, the father said, he was concerned about letting her have unsupervised visitation. As a result, he said, the mother's visits were supervised for approximately one year, after which the father allowed unsupervised visits with the mother. After the mother no longer had supervised visitation, the father began allowing the children to spend time at their mother's home during the week, provided they kept up their grades; he also agreed to allow the mother to enroll the daughter in ballet class so that they would have an activity to enjoy together. According to the father, those were bad decisions on his part because the children often failed to tell their mother that they had homework, the homework would not get done, and the father would have to "double up on them" to make up the missed homework. Thus, the father concluded, the mother's home was more appealing to the children because *1231 he was the parent constantly requiring them to do their schoolwork.
The father admitted that he had been fired from one job because he had assaulted a coworker. According to the municipal court records, the father threatened to kill the coworker and was verbally abusive to the coworker. Those records also reveal that the father hit the coworker in the face, causing, among other things, a black eye, and that he kicked the coworker in the side of the head with a steel-toed boot. The father was charged with assault in the third degree, menacing, and harassment as a result of the altercation; he pleaded guilty and received a suspended sentence. The father also admitted that he had been arrested for stalking the mother based on the previously described incident at the mother's former place of employment. However, the father denied physically assaulting the stepmother or spanking the children excessively. He did admit to knocking a hole in the sheetrock wall of his Indiana residence by opening a door too forcefully during an argument.
Both of the parties' children testified. The parties' daughter testified that her father and stepmother got in little arguments and that they sometimes screamed and hollered at each other. She denied that she had witnessed her father and stepmother pushing or shoving each other. She did state that she had witnessed her father punch a hole in the wall and throw a table at the wall while arguing with the stepmother. She also said that her stepmother had pulled a telephone from the wall during an argument with the father. The daughter further testified that the father had said that he would kill the mother on at least one occasion. She also recounted that the father had hit the parties' son in the back of the head when the son told him that he would like to live with the mother. When questioned about whether the father's spankings were excessively forceful, the daughter responded that they were not. The daughter refused to answer when asked which parent she would prefer to live with. At the close of her testimony, the trial judge asked the daughter if she would like to speak with him in private. Although the father objected, an in camera meeting between the trial judge and the daughter did occur.
The parties' son testified that his father and his stepmother had a good relationship. He admitted that he had seen his stepmother pull a telephone out of the wall, but he denied seeing his father make a hole in the wall during an argument; he later answered that his father had, in fact, knocked holes in the wall. The son said that he had heard his father threaten to kill the mother; he said that the father's threat was made in the car on the return to Indiana from an earlier court appearance. Upon further examination, the son admitted that the father's threat had included the grandparents and the stepfather. The son admitted that he had threatened to kill himself; he explained that his father had punished him and he was angry at him at that time. The son testified that he preferred to live with the father. When asked, the son declined an in camera meeting with the court.
Lisa Hinkle, the guidance counselor at the school the children attended before the move to Indiana, testified that both children had reported incidents of physical fighting between the father and the stepmother. Hinkle also testified that the son had reported that he did not like the punishments, spankings, and yelling at his father's home and that he did not like being "talked to like he was a lowlife." Hinkle reported the situation to the Department of Human Resources. Hinkle said that on one occasion the son had told her that things had gotten so bad at his father's *1232 house that he was either going to run away or was "not going to be there," which Hinkle stated she took to mean that the son was considering suicide. She said that both children had told her they would like to live with their mother.
The children's maternal grandmother testified that the mother was a good mother. She also said that in the past the father had threatened her with not seeing the children. She said that she and her husband got along well with the father as long as they were doing what the father wanted and he was in control. The grandmother further testified that the parties' son was angry when visitation ended; she said he would tell her that "nobody would listen to him." The grandmother said that the son's testimony on the stand was "completely opposite" of what he had been telling the grandparents. The grandmother said that the son had told the grandparents that he would not say anything in court to the judge because he was afraid of the father.
The mother argues that the trial court erred by failing to award her custody of the parties' children. The trial court specifically concluded that the mother had failed to meet the burden imposed by Ex parte McLendon, 455 So.2d 863 (Ala.1984). In particular, the judgment stated that the court found the mother's allegations of abuse to be unfounded. The mother argues that the evidence supports a determination that she met the Ex parte McLendon standard and that the trial court's comments on the record at the close of the custody hearing are at odds with the findings stated in the judgment denying her custody.
When a noncustodial parent seeks to modify custody after the other parent has been awarded physical custody to the exclusion of the noncustodial parent, a trial court must apply the standard set out by our supreme court in Ex parte McLendon. The McLendon standard is well-settled. A parent seeking a change in custody must establish that the change would materially promote the interests and welfare of the child and that the benefits of the change in custody would more than offset the inherently disruptive effect caused by uprooting the child. Ex parte S.T.S., 806 So.2d 336, 342 (Ala.2001). The mother agrees that this standard applies; however, she argues that the evidence of the father's abusive behavior and anger-control problems and the evidence indicating that she is now recovered from her depression and has a stable and secure home, combined, are sufficient to overcome the presumption in the father's favor. She argues that the Alabama Custody and Domestic or Family Abuse Act, Ala.Code 1975, § 30-3-130 et seq., is intended to prevent an award of custody to a parent who has committed domestic or family abuse. Most likely, the mother is referring to § 30-3-133, which establishes a presumption that it is not in the best interest of children that they be placed in the custody of a party who is guilty of domestic or family abuse, and § 30-3-134, which states that "a finding that domestic or family violence has occurred since the last custody determination constitutes a finding of change in circumstances."
The trial court addressed the parties at the close of the modification hearing. Included in those comments were statements indicating the trial court's observation that the father had an anger-control problem that had resulted in his children being afraid of him and the loss of at least one job and the observation that the mother had overcome her earlier problems. However, the trial court's comments also indicated that he did not think that the father had abused the children:

*1233 "Now, like I say, I'm not accusing you of anything, but I've heard what I have heard and I've observed what I've observed. While I can appreciate where you are coming from  I know you feel like you were there when nobody else was, and that you have stood by these children and that you have done the best you can do with them, and I understand that. I want you to know that I'm keeping that in mind. But it might be time to loosen the grip just a little bit. And it might be time to see about getting a little bit of help with that temper of yours."
The record contains conflicting evidence concerning the father's relationship with the stepmother, his displays of anger, and his discipline of the children. In addition, the evidence concerning the children's desire to live with the mother and their complaints concerning their daily lives with the father were disputed by testimony from the children themselves. "The trial court is in the best position to make a custody determination  it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing." Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).
Furthermore, the trial court did not find that domestic or family abuse had occurred after the last custody determination. In fact, the trial court specifically found that the mother's abuse allegations were unfounded. Thus, the mother's reliance on the Alabama Custody and Domestic or Family Abuse Act is misplaced.
The burden imposed by Ex parte McLendon requires that the mother prove both that the children's best interest would be materially promoted by a change in custody and that the inherent disruption caused by a change in custody would be offset by the good brought about by the change in custody. The trial court determined that the mother had not met this high burden, and the record contains evidence supporting that conclusion. In addition, the trial court interviewed the parties' daughter in camera, and that examination was not transcribed; therefore, we presume that the testimony adduced during that interview supports the trial court's judgment. See Hughes v. Hughes, 685 So.2d 755, 757 (Ala.Civ.App.1996). In light of the burden imposed by Ex parte McLendon, our standard of review, the conflicting evidence presented at trial, and the fact that the trial court interviewed the parties' daughter in camera, we are constrained to affirm the trial court's judgment.
The father's request for an attorney fee on appeal is granted in the amount of $1,000.
AFFIRMED.
PITTMAN, J., concurs.
THOMPSON, J., concurs in the result, without writing.
YATES, P.J., and MURDOCK, J., dissent, with writings.
YATES, Presiding Judge, dissenting.
After reviewing the record, I believe that the trial court's judgment is not supported by the evidence. The evidence of abuse recounted by the mother, the school counselor, and the children, and the father's conviction for violent behavior support a change of custody to the mother. The children described both verbal and physical abuse against themselves and the father's current wife. I note that the trial court was concerned about the father's temperament. At the conclusion of the hearing, the trial court suggested that the father seek anger-management and parenting *1234 counseling and made the following observations regarding the father:
"Based on some of the other testimony it appears you may have trouble controlling your anger. And based on your own testimony it appears that you aren't willing to accept that and acknowledge it.
"Further observation is that this anger of yours has pretty much caused an awful lot of trouble in your life. Probably caused this lawsuit, probably has caused you to lose at least one job, maybe more, probably has caused you to have at least one court conviction and maybe two. And probably is the source of the fear of your children."
This evidence of abuse, along with the father's move to Indiana, support a finding of a change in circumstances. See § 30-3-134, Ala.Code 1975 (providing that "a finding that domestic or family violence has occurred since the last custody determination constitutes a finding of change in circumstances"), and Ex parte Murphy, 670 So.2d 51 (Ala.1995) (a custodial parent's change in residence is a factor for the trial court to consider in deciding whether custody should be modified).
The mother, who by her own admission had had trouble in the past, sought therapy and now has her life on track and is able to provide a stable environment for the parties' children. In my opinion, the evidence in the record supports a change in custody. Accordingly, I must dissent.
MURDOCK, J., concurs.
MURDOCK, Judge, dissenting.
I join Judge Yates's dissent. I write separately to comment upon an aspect of the main opinion that is not addressed by Judge Yates.
The main opinion states that "[t]he burden imposed by Ex parte McLendon [, 455 So.2d 863 (Ala.1984),] requires that the mother prove both that the children's best interest would be materially promoted by a change in custody and that the inherent disruption caused by a change in custody would be offset by the good brought about by the change in custody." 893 So.2d at 1233 (second emphasis added). This statement implies that the "material promotion" standard and the requirement that the good that will be brought about by a change in custody will more than offset the disruption that will be brought about by that change are two separate standards. Ex parte McLendon, however, does not characterize them as such. To the contrary, whether a change in custody will result in the promotion of a child's interest that is "material" depends upon (that is, is defined by) whether the good that will be brought about by the proposed change will more than offset the disruptive effect of that change. This is evident from the manner in which the McLendon opinion first states the "material promotion" standard and then, in successive paragraphs, proceeds to restate that standard with terminology that the Supreme Court clearly considered to be more informative of the standard:
"The correct standard in this case is:
"`Where a parent has transferred to another [whether it be a non-parent or the other parent], the custody of h[er] infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless [s]he can show that a change of the custody will materially promote h[er] child's welfare.'
"Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947), quoting the Supreme Court of Virginia, Stringfellow v. *1235 Somerville, 95 Va. 701, 29 S.E. 685, 687, 40 L.R.A. 623 (1898).
"Furthermore,
"`[This] is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court's satisfaction that material changes affecting the child's welfare since the most recent decree demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.'
"Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976).
"... The parent seeking the custody change must show not only that she is fit, but also that the change of custody `materially promotes' the child's best interest and welfare.

"....
"... Although the best interests of the child are paramount, this is not the standard to be applied in this case. It is important that she show that the child's interests are promoted by the change, i.e., that she produce evidence to overcome the `inherently disruptive effect caused by uprooting the child.' Wood v. Wood, 333 So.2d at 828."
Ex parte McLendon, 455 So.2d 863, 865-66 (Ala.1984) (emphasis added).
Our Supreme Court explained in Ex parte J.M.F., 730 So.2d 1190 (Ala.1998):
"It is ... well established that a noncustodial parent seeking a change of custody must show not only that he or she is fit to have custody, but that the change would materially promote the child's best interest. Ex parte McLendon, 455 So.2d 863 (Ala.1984). This requires a showing that the positive good brought about by the modification would more than offset the inherently disruptive effect caused by uprooting the child. McLendon."
Ex parte J.M.F., 730 So.2d at 1194 (emphasis added). Consistent with this statement of our Supreme Court in Ex parte J.M.F., the plurality opinion in DiIorio v. Long, 839 So.2d 650, 655 (Ala.Civ.App.2001), explained: "As McLendon indicates, whether ... the promotion of a child's welfare that will result from a custody modification will be material [is] ... measured against the disruption that will be caused by uprooting the child from the existing custodial arrangement." And in Blackmon v. Scott, 622 So.2d 393, 394 (Ala.Civ.App.1993) (quoted with approval in Carroll v. Carroll, [Ms. 2020787, May 14, 2004] ___ So.2d ___, ___ (Ala.Civ.App.2004)), we find a reference to the "material promotion" standard as one "requiring the [parent seeking to modify custody] to show that a change in custody would materially promote the welfare and best interests of the child, offsetting the disruptive effect of uprooting the child." See also R.K. v. R.J., 843 So.2d 774 n. 4 (Ala.Civ.App.2002); Smith v. Smith, 865 So.2d 1207, 1211 (Ala.Civ.App.2003) (Murdock, J., concurring in the result); Gamble v. Segers, 833 So.2d 658, 662 (Ala.Civ.App.2002) (referring to a parent's burden of demonstrating "how a change of custody will materially promote the best interests and welfare of the child so as to outweigh the disruption caused by such change of custody") (emphasis added); and Riley v. Riley, 882 So.2d 342, 345 (Ala.Civ.App.2002) (quoting Ex parte J.M.F.). See generally Spears v. Wheeler, 877 So.2d 607, 609 (Ala.Civ.App.2003) *1236 (Murdock, J., dissenting), and cases cited therein.
This understanding of McLendon is the only one that, in my view, (a) aligns with a literal reading of the McLendon opinion itself and (b) is logically consistent with the ultimate objective of determining whether a custody modification would be in a child's best interest.
NOTES
[1] This case was originally assigned to another judge on the Court of Civil Appeals. It was reassigned to Judge Crawley on June 9, 2004.