PITTMAN, Judge.
Joann Ingram (“the mother”) appeals from- a judgment of the Elmore' Circuit Court (“the trial court”) modifying a previous custody judgment, which had awarded the mother sole legal and physical custody of the minor child (“the child”) of the mother and Chester W. Matthews (“the father”). We reverse the judgment of the trial court and remand the cause.

Facts and Procedural History

The mother and the father were divorced pursuant to a judgment entered by the trial court in November 2012 (“the divorce judgment”). The child was six years old when the divorce judgment was entered. The divorce judgment, which was based upon an agreement between the parties, awarded the mother sole legal and physical custody of the child and ordered the father to pay child support. In addition, the divorce judgment stated that the father “remains a credible threat to the physical ■ safety of the [mother] and that the [mother] has been the victim- of a history of domestic violence and abuse.” Accordingly, the divorce judgment ■ “permanently restrained- and enjoined [the father] from engaging in abusive conduct toward the [mother].” The divorce judgment also awarded the father weekend-visitation rights with respect to the child, although the divorce judgment stated that the father’s visitations were to be supervised for approximately one month after the entry of the divorce judgment and prohibited the father from allowing the child to be in the presence of certain named individuals.[1]
According to the father, in October 2013, the mother and the father began living together again in an attempt to reconcile. The mother, on the other hand,- testified that, at that time, she and the father began living in independent portions, of the same duplex house and that she had lived in that, house only because the child “needed a dad.”
The mother and the . father separated again,in January 2014, at-which time the mother and the child moved, out of the duplex and onto property owned by the mother’s parents (“the maternal grandparents”). According to the father, the child began living in a house with the maternal grandparents, while the mother began living in a mobile home on the maternal grandparents’ property. The mother admitted at the trial that she had lived in the mobile home at one point, but she stated that the mobile :home had since been sold and that she and the child had been living together, in the maternal grandparents’ house for eight months. The mother testified that, when she and the father were married, they had lived “a little bit of everywhere,” including in the maternal grandparents’ home. The mother’s father (“the maternal grandfather”) confirmed that the child had “always lived with [the] mother” and that, during some of that time, they. had lived with the maternal grandparents.
• In February 2014, the maternal grandfather filed a pro se petition' in the trial court, in which he requested “full legal and physical custody” of the child. In his petition, the maternal grandfather explained that awarding him custody of the- child would qualify the child for “college benefits” through the United States Army,- of which the maternal grandfather is a veteran. Attached to the maternal grandfather’s "petition was an affidavit that had been executed by the mother, in which the *468 mother stated that she “agree[d] with the petition that [the maternal ■ grandfather had filed] for better education and moré security] in [the child’s] future.”[2]
The maternal grandfather later testified that a counselor employed by the Department of Veterans Affairs had recommended to the maternal grandfather that he should attempt to gain custody of the child so that the child could be claimed as the maternal grandfather’s dependent and receive government benefits from the military. Both the maternal grandfather and the mother testified that they had intended for the maternal grandfather to request that he and the mother share joint custody of the child, and the mother testified that the underlying purpose of the petition had been simply to help provide for the child’s future financial needs.
The mother testified that the child’s past and present needs had been, and were being, met and that the maternal grandfather’s petition was not filed because the child had been deprived of any necessities. Although the maternal grandfather, testified that there had never been a time that' the mother was unable to provide for the child, he did testify that he had filed the petition, in part, “to help financially with supporting [the child] because his child support is always late.” The maternal grandfather testified that the government benefits would have come in the form of a check in the child’s name and would have been placed in a separate account. The maternal grandfather’s petition was dismissed before the trial took place in this matter.
In April 2014, the father filed his own pro se petition requesting that the trial court award him custody of the child. In that petition, the father asserted that he loved the child, that he had supported the child since the .child’s birth, and that, “if [the] mother, doesn’t want [the child],” then the father, did. After engaging legal counsel, the father later amended his petition to assert that a change in circumstances justified modification of the custody provisions in the divorce judgment. Specifically, the father pointed out in his amended petition that the mother had consented to a petition to award the maternal grandfather custody of the child, and the father asserted that the mother “is no longer able or willing to care for [the child].”
Shortly after filing his original petition requesting an award -of custody, the father moved to Florida where, at the time, .of the trial in this matter in September 2014, the father lived in. a three-bedroom, one-bathroom house with his sister. According to the father’s testimony and other filings in this matter, the father’s new home in Florida is approximately 600 miles from where the mother and the child were residing at the time of the trial. The father, however, claimed that he believed his sister’s home is approximately a two-hour drive from some unnamed members of the mother’s family.
The father testified that, at the time of the trial, he had’been working as a welder for one month and that, before that time, he had worked at various other jobs he had obtained through a temporary-employment agency.' There is no testimony in the record regarding how much income the father earns as a welder or how much he earned when the parties were divorced. The father also testified that his sister’s house is big enough for the child, that he is able to provide the'child with the care he *469 needs, and that he had heard that the school system in the relevant area in Florida was “excellent.”
The father testified that the mother had not cooperated with the father regarding decisions affecting the child and had failed to keep the father informed regarding the child’s health care and education. He asserted that the mother had insisted that the father get information regarding the child from the maternal grandparents and not from the mother herself. The mother admitted that she had not allowed the father to participate in decisions regarding the child’s. health, education, and welfare and that she had required the father to communicate through the maternal grandparents because, she said, every time she speaks with the father, he “curses [her] out.”
The father also testified that the mother had interfered with the father’s visitation rights by insisting that the father’s visitations take place on the maternal grandparents’ property. The mother testified that that had occurred only once because, she claimed, the father had threatened to abscond with the child. The father admitted that, since he had moved to Florida approximately five months before the trial, he had attempted to visit the child only twice.
The father also testified that the mother had insisted that the child use a “speaker phone” when talking to the father on the telephone and that the mother had, at times, attempted to cut short the father’s telephone conversations with the child. The father also testified, however, that the child had acted as if he did not like talking to the father on the telephone. The mother denied that she had interfered with the father’s telephone conversations with the child.
The father has a criminal record. Specifically, eight years before the trial in this matter and before .the divorce judgment was entered, the father was incarcerated after a domestic-violence incident against the mother while the mother was pregnant with the child; that incident had involved the usq of a .weapon. The father was arrested again on a misdemeanor domestic-violence charge in 2012, although it is not clear from the record whether that arrest occurred before or after the divorce judgment had been entéred. With respect to the 2012 arrest, the father testified that, while arguing with the mother, he had pushed her against their mobile home, that she had retreated to the bathroom, and that he 'had stabbed a sword through the bathroom door. The charges stemming from the- 2012 incident were dismissed. The father denied having ever had anger or violence problems -with anyone other than the mother.
The mother testified that, in January 2014, the father had hit her and had threatened to kill her in the presence of the child and that the father is verbally abusive to the mother and the child. The father denied that he had threatened to kill the mother or that he was verbally abusive to the child.
The father testified that he had spanked the child with a belt but that he had not been physically abusive. The mother testified that, in her opinion, the father’s discipline-rises to. the level-of abuse. The maternal grandfather testified that he had witnessed the father whip the child with a belt and leave marks on the child.
The father admitted that, at the time of the trial, there was at least one outstanding warrant for his arrest, which, the father testified, had been issued in Massachusetts approximatély 20 years earlier in connection with a charge against the father alleging the receipt of stolen property. The father testified that, at the time *470 he was arrested in Massachusetts, he-was homeless and that a person had asked him to hold a bag of coins that had been stolen from a newspaper-vending machine.
The father testified that he had had a drug problem in the'past but that the last time 'he had abused drugs was eight months before the trial, when he had used methamphetamine while living with the mother. The father testified that he had also witnessed the mother using drugs at that time, although the mother denied that she had ever used illegal drugs.
The father is a diabetic. The mother testified that, on one occasion, the father had choked the mother while she was sleeping and that he had later claimed that his actions had been caused by a diabetic “attack.” The mother testified that the father had not properly monitored his blood sugar, that he had not taken care of his health, and that - she had had to call paramedics for him approximately 10 times in the past.
The mother testified that, at the time of the trial, she was earning approximately $1,000 per month working as a housekeeper. There is no testimony indicating how much income the mother was earning at the time of the parties’ divorce. As noted, the mother testified that, at the time of the trial, she was no longer living in a mobile home on the maternal grandparents’ property and that she and the child were living with -the maternal grandparents. The mother testified that the child’s needs are being met; The maternal grandfather confirmed that the mother always makes sure that the child’s needs are met and that, if the mother needs help, she gets it from the maternal grandfather. It is undisputed that the child is excelling in school. At the time of the trial, the mother was nine months’ pregnant and unmarried.[3]
At the conclusion of the trial,’ the trial court indicated that it was going to find that the mother, by consenting to the maternal grandfather’s petition, had intended to relinquish her custody rights to the maternal grandfather and had essentially “walk[ed] away from the child.” Thereafter, the trial court entered a judgment awarding the mother and the father joint legal custody of the child, with the father being awarded primary physical custody, awarding the mother visitation rights, and ordering the mother to pay the father child support. In its judgment, the trial court specifically noted that the mother had consented to the maternal' grandfather’s inquest for custody; that the mother was pregnant, unmarried, and living with her parents; and that the father was employed and living with his sister in a home in Florida with sufficient space for the child.
On appeal, the mother argues that the evidence did not satisfy the standard for modifying custody that was recognized in Ex parte McLendon, 455 So.2d 863 (Ala. 1984).

Standard of Review

“It is well settled that when a trial court receives ore tenus evidence in a child-custody-modification proceeding and bases its judgment on its findings of fact, that judgment will not be reversed absent an abuse of discretion or a showing that the findings are plainly and palpably wrong. Smith v. Smith, 865 So.2d 1207, 1209 (Ala.Civ.App.2008). See also West v. Rambo, 786 So.2d 1138, 1140 (Ala.Civ.App.2000). A judgment based on ore tenus evidence is presumed to be correct and will be affirmed if *471 supported by competent evidence. N.G. v. L.A., 790 So.2d 262, 265 (Ala.Civ.App. 2001). The trial court’s opportunity to observe -witnesses is- especially important in child-custody cases- because the trial court is in the -unique position to directly observe the witnesses and to assess their demeanor and credibility. Fell v. Fell, 869 So.2d 486, 494 (Ala.Civ. App.2003). However, when this court is presented with an issue of law, we review the judgment of the trial court de novo, without affording it any presumption of correctness. See Barber v. Moore, 897 So.2d 1150, 1153 (Ala.Civ. App.2004).”
Patrick v. Williams, 952 So.2d 1131, 1137-38 (Ala.Civ;App.2006). The ore tenus rule does not cloak with a presumption of correctness a trial court’s incorrect application of law to the facts. Hartin v. Harbin, 171 So.3d 45, 47 (Ala.Civ.App.2015).

Analysis

“A parent seeking to modify a previous custody order bears a heavy burden of proof. The parent must prove that a material change in circumstances has occurred since the prior judgment, and that a change of custody will materially promote the child’s best interest and that the benefits of the change will more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, 455 So.2d 863, 866 (Ala.1984).”
Vick v. Vick, 688 So.2d 852, 855 (Ala.Civ. App.1997).
Although the trial court básed its ruling, in part, on the facts that the father had obtained a job and a place to live arid that the mother was unmarried and had become pregnant, as shown by the trial court’s statements at the conclusion of the trial, the trial court’s primary concern appears to have been the fact that the mother had consented to the maternal grandfather’s -filing of a petition seeking sole custody of the child.-
Although both the maternal grandfather and the mother testified at the trial that they had intended to'share joint custody of the child so that the child might receive government benefits, the petition itself clearly and undisputedly requested the trial court to award sole custody of the child to the maternal grandfather. The trial court was in the best position to judge the credibility of the witnesses arid to resolve any conflict iri the evidence presented. Accordingly, the trial court did not err to the extent it made a factual finding that the mother was willing to. give .up all of her custody rights in favor of the maternal grandfather. - . ;
“In order to prove a material change of circumstances, the noncustodial parent must present sufficient evidence indicating (1) that there has been a change in the circumstances existing at the time of the original custody judgment or that facts-have-been revealed that -were-unknown at the time of that judgment, see Stephens v. Stephens, 47 Ala.App. 396, 399, 255 So,2d 338, 340-41 (Civ.App. 1971), and (2) that the change in circumstances is such as to affect the welfare and best interests of the child.” ,
C.D.K.S. v. K.W.K., 40 So.3d 736, 740 (Ala. Civ.App.200,9).
Assuming that the mother’s willingness to relinquish custody to the maternal grandfather, as well as her pregnancy and the facts that the father had obtained a job and a place to live in Florida, affect the welfare and best interest of the child and are, therefore, material changes in circumstances’under-the McLendon standard, it still rernains that “[a] mere change in circumstances is not enough to support a change in custody from the custodial parent to the petitioning parent.” King v. *472 King, 636 So.2d 1249, 1253 (Ala.Civ.App. 1994); The father also had the “heavy” burden of proving that a change in custody would materially promote the child’s best interests.to such an extent that the change would more than offset the inherently disruptive effect caused by. uprooting the child. Vick, 688 So.2d at 855. “[I]n the context of child-custody; proceedings, the dominant consideration is always the best interest of the child,” Ex parte Farm, 810 So.2d 631, 638 (Ala.2001), and “stability is inherently more beneficial to a child than disruption.” Ex parte Cleghorn, 993 So.2d 462, 468 (Ala.2008).
There was no evidence indicating that a change in custody would materially promote the child’s best interests. The testimony establishes that, at the time of the trial, the child’s needs were being met by the mother, with help from the maternal grandparents. There is no evidence indicating that the father’s situation had improved to such an extent that the child would be better: off living with the father. Indeed, there was no evidence indicating that the job the father had obtained as a welder allowed him to earn more income than he had in the past or that the house in which the father was living was an improvement over his prior situation or the maternal grandparents’ home, where the child was living at the time of the trial.
“It is not enough that the parent show that the parent has reformed his or her lifestyle, or improved his or. her.financial position; the parent must show both that he or she is fit and that the custody change materially promotes the best interests . and welfare of the child. McLendon, 455 So.2d at 866.”
Gamble v. Segers, 833 So.2d 658, 661 (Ala. Civ.App.2002). Likewise, there is no evidence indicating that the-prospect of the mother having another baby would prevent her from being able to care for the child.
Regardless, there was no evidence indicating that any alleged benefits to the child of a change in custody would more than offset the inherently disruptive effect caused by >upro.oting the child, taking him out of his current school where he was undisputedly doing well, and moving him to another state -600 miles away from his mother, with whom the child had lived his entire life, to live with the father and the father’s sister. Accordingly, we conclude that the trial court erred in modifying the custody provisions set out in the divorce judgment. We therefore reverse the trial court’s judgment and remand the cause for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and THOMAS, MOORE, and DONALDSON, JJ., concur.

. There is no explanation in the record as to why those individuals were not to be allowed to be in the presence of.the child.

. The father claimed that the mother did not give him notice of the maternal grandfather's petition and that he had learned about it from a “third parly.-” The mother testified that she had indeed informed the father about the petition.

. The mother testified that she had become pregnant while living in the duplex with the father after the parties had been divorced but that the child was not the father’s.